THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR L. SEIBER, Defendant-Appellant.

Third District   No. 78-326

Opinion filed August 23, 1979.—Modified on denial of rehearing September 26, 1979.

Robert Agostinelli, of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This is an appeal by the defendant, Arthur L. Seiber, from convictions for attempt murder and the unlawful use of weapons following a jury trial. He was sentenced to concurrent terms of imprisonment of not less than 5 nor more than 15 years for the attempt murder and 364 days for the unlawful use of weapons.

At the trial, the evidence adduced conclusively established that the defendant shot John Prunty. The only issue raised concerning the evidence is whether the act of shooting Prunty was proven beyond a reasonable doubt to have not been in self defense.

As the State's first witness, the victim, John Prunty, was called. He testified that he arrived at Wade's Inn, a Peoria tavern, between 4:30 and 5 on the afternoon of January 20, 1978. While Prunty was talking to some

friends, the defendant came up behind him, touched his shoulder, and asked Prunty if he had something against him (the defendant). Prunty told the defendant, whom he had seen once before, "No, I don't even know you." The defendant said, "Let's keep it like that," and walked away. Sometime later, as Prunty and some friends were seated at a table, Prunty noticed the defendant kept staring at him. Prunty, calling the defendant over, asked what he had done to the defendant and offered to buy the defendant a drink. As the defendant and Prunty got up from the table, Prunty heard a sound like that of an air gun and felt a pain in his stomach. Prunty fell on the defendant and hung on him. He heard another shot and felt a sting in his side. Prunty and the defendant then "rassled," Prunty being either pushed or falling to the floor where he was shot again in the chest. He saw the defendant standing over him with a gun which the defendant pointed at him and clicked two or three times. On cross-examination Prunty said he had first seen the defendant at Wade's about one month prior to the instant occurrence and admitted that in a prior statement to a police officer he may have omitted referring to having been shot before the struggle with the defendant began.

Robert Hightower, the State's second witness, had been seated at the table with John Prunty. He observed Prunty grab the defendant by his coat and slam him against the floor. When they stood up again the defendant drew a pistol and fired at Prunty. After Prunty again fell to the floor, the defendant offered the gun to anyone in the bar, but no one would take it. The defendant then walked out.

Frank Wade, the owner of Wade's Inn, was also present. He heard a door slam and saw that Prunty had the defendant by the collar and they were "rassling". The defendant then shot Prunty four times and Prunty fell to the floor. The defendant started out the door, but returning, he pointed the gun at Prunty's head. Somebody hollered, "Don't shoot that boy no more." The defendant then "revolved" the pistol. Afterward, the defendant tried to give the gun away to Wade and left.

Michael Smith testified that he saw the defendant at Spanky's Tavern in Peoria at 7 or 7:30 p.m. on January 20, 1978. The defendant informed Smith that he (defendant) was a "wanted man," having just shot a man at Wade's. When defendant left, he left in a cab.

Craig Ganda, a Peoria police officer, arrived at Wade's Inn shortly after the shooting. Examining Prunty, he found four bullet wounds, two on Prunty's left side, one at the center of his back, and one on the lower part of his shoulder.

The defendant, testifying in his own behalf, stated he did not know John Prunty personally prior to January 20, 1978, but had seen him before. He had seen Prunty one evening prior to Christmas in a private club wherein the defendant was talking with Minnie Robertson, a woman

friend of Prunty's, when Prunty walked up and grabbed her by the arm to lead her away. The defendant asked Prunty to show the lady some respect, and a brief argument ensued between Prunty and the defendant.

The defendant next encountered Prunty at the same club some two weeks later. The defendant was seated at the bar when Prunty bumped into him, nearly knocking him from the bar stool. The defendant asked what Prunty's problem was, but Prunty just grinned and walked away, saying: "I'm going to get a chance to help you, guy." A subsequent encounter with Prunty also occurred at this club when the defendant was asked by Prunty whether he (defendant) wanted a drink. When the defendant replied negatively, Prunty said he wasn't going to buy him one anyway.

On January 20, 1978, the defendant, after having been at Wade's for a while, was sitting at a table when he heard a door slam behind him. He turned around and Prunty was standing behind him with his hands in his pocket and staring down the defendant's back. Prunty then walked away. The defendant then got up, walked over to Prunty, tapped him on the shoulder and asked Prunty why he was picking on the defendant. Prunty just grinned and walked away. The defendant sat down, but later in the evening, after the defendant had gone home, exchanged cars with his wife, and returned, the defendant was seated at the bar talking with Minnie Robertson and Willie Barber when he noticed Prunty behind him again. Prunty moved away.

A short time later as the defendant walked by the table at which Prunty was seated, Prunty assaulted the defendant, jabbing him in the stomach and picking him up by the lapels of his coat, slamming him against the door. They wrestled and Prunty kept ramming the defendant's head against the door. Prunty then dropped his hand as if to go for his jacket and the defendant went for his gun. The defendant testified that he tried to shoot Prunty in the lower part of his body so as not to seriously wound him. The defendant only intentionally fired the gun once, but it went off three other times during the struggle. The defendant denied intending to shoot Prunty prior to being assaulted and said he was carrying the gun because he had intended to pawn it.

After trying to give the gun away, the defendant left the bar, drove off, and threw the gun away. He then went to Spanky's bar where he left his car, taking a cab to his sister-in-law's. The defendant said he had only wanted to hurt Prunty enough to get him off and that he feared for his life because he had known Prunty to carry a gun and had heard that Prunty had previously been involved in some shootings.

■▌ Unless the evidence is so palpably contrary to the verdict or so unsatisfactory as to raise a reasonable doubt of a defendant's guilt, a reviewing court will not set aside a jury's verdict, for any inconsistencies

or discrepancies in the testimony of the witnesses, any possible bias or interest affecting the credibility of the witnesses, and the weight to be attributed to the testimony of the witnesses are matters peculiarly within the province of the jury. This is so because the jury is in a better position to assess each witness' ability to remember and opportunity to observe, weighing any discrepancy in light of all the evidence. *People v. Henderson* (1976), 39 Ill. App. 3d 502, 348 N.E.2d 854.

■ Once the affirmative defense of self-defense is raised by the defendant, it becomes the State's burden of proving beyond a reasonable doubt the defendant's act was not in self-defense, in addition to proving all the elements of the offense beyond a reasonable doubt. (*People v. Baker* (1975), 31 Ill. App. 3d 51, 334 N.E.2d 249.) The elements of the defense are:

> "(1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. There is a further principle involved, when, as in the instant case, the defendant uses deadly force. This principle limits the use of deadly force to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony." (*People v. Williams* (1965), 56 Ill. App. 2d 159, 165-66, 205 N.E.2d 749, 752.)

Should, in the judgment of the jury, any of the evidence produced at the trial negate the existence of any one of these elements beyond a reasonable doubt, the State has carried its burden.

■■ The only evidence relating to the initiation of the incident was the testimony of the victim and of the defendant. The victim said the defendant started it, and the defendant said the victim started it. A jury is not required to accept a defendant's version (see *People v. Padget* (1974), 21 Ill. App. 3d 426, 315 N.E.2d 646), and therefore this jury could have found, from the evidence, that the defendant was the aggressor. Furthermore, although a scuffle occurred between the victim and the defendant, the jury could, after considering the defendant's efforts to withdraw or retreat and the nature, extent and character of the efforts of the victim to harm the defendant, disbelieve the defendant's claim that deadly force was required. (See *People v. Rosas* (1977), 52 Ill. App. 3d 555, 367 N.E.2d 986.) Likewise, the jury could have considered the defendant's flight from the scene and discarding of the pistol, as well as his attempt to give the pistol away, as evidence of his consciousness of

guilt and thereby reject the theory of self-defense. (See *People v. Harris* (1972), 52 Ill. 2d 558, 288 N.E.2d 385; *People v. Lynch* (1976), 43 Ill. App. 3d 1039, 358 N.E.2d 17; *People v. Henderson* (1976), 39 Ill. App. 3d 502, 348 N.E.2d 854.) Lastly, both the victim and the witness Wade testified that, after the victim was already shot and lying on the floor, the defendant pointed the gun at the victim's head and pulled the trigger but the gun did not fire. Since deadly force cannot be justified as self-defense once the aggressor has been disabled or disarmed (*People v. Driver* (1978), 62 Ill. App. 3d 847, 379 N.E.2d 840), the jury could have found that the defendant made an attempt to kill the victim after deadly force was no longer necessary to defend himself. Therefore, we cannot conclude that the jury's verdict is so contrary to the evidence as to raise a reasonable doubt of the defendant's guilt.

■ The sentence imposed as a result of this finding of guilt of attempt murder is challenged as being excessive, and the sentencing procedure, according to the defendant, violated equal protection and due process standards because, in electing between being sentenced under the sentencing law in existence at the time the offense occurred and the sentencing law in effect after February 1, 1978, the trial court did not specify the exact terms of imprisonment which would be imposed under each scheme of sentencing should the defendant elect to be sentenced under that scheme. This challenge to the election process has been raised before this court in identical issues, and rejected, in a series of cases beginning with *People v. Peoples* (1979), 71 Ill. App. 3d 842, 391 N.E.2d 798. The reasoning in those cases will be followed here as well, and the argument of the defendant is, therefore, rejected.

■■ In assessing the excessiveness of the sentence, it must first be recognized that the trial court is in a better position than is the reviewing court to make a sound determination of the punishment to be imposed and, as a result, a reviewing court, absent a showing of an abuse of discretion, will not disturb the sentence imposed. (*People v. Short* (1978), 62 Ill. App. 3d 733, 379 N.E.2d 360.) The sentence imposed is within the statutory limits for attempt murder (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4(c)(1) and 1005—8—1), and the nature and circumstances of the offense and the history and character of the defendant seem to warrant a greater minimum than might otherwise have been imposed.

This defendant has prior convictions for battery, unlawful use of weapons and resisting arrest. These prior convictions, added to the evidence that the defendant attempted to shoot the victim in the head while he was lying on the floor, certainly would warrant the imposition of a greater minimum sentence. We can find no abuse of discretion.

An opinion was filed by this court in the instant appeal on August 23, 1979. On September 11, 1979, the defendant filed a petition for rehearing.

Subsequently on September 21, 1979, the opinion of August 23, 1979, was ordered withdrawn and in lieu thereof this modified opinion is filed. It is further the order of the court that the petition for rehearing be denied.

Accordingly, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

STOUDER, P. J., and STENGEL, J., concur.