THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THEODORE WEST WARD, Defendant-Appellant.

Fourth District   No. 15829

Opinion filed April 25, 1980.

Richard J. Wilson and Don L. Johnson, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Gary J. Anderson and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

The most important issue in this case is whether evidence is substantively sufficient to prove rape when it shows that an accused has taken a victim into custody by the threat of imminent use of deadly force and subsequently the victim, without offering resistance or objection, submits to intercourse with the accused because she fears that not to do so would anger him and cause him to inflict severe bodily injury upon her.

On May 16, 1979, after trial by jury in the circuit court of Champaign County, defendant, Theodore West Ward, was convicted of the March 8,

1979, rape of a certain victim but was acquitted of having committed an aggravated kidnapping of her on that date. On June 22, 1979, he was sentenced to 25 years' imprisonment. At trial he testified to having had sexual intercourse with the victim but claimed she consented. On appeal he asserts (1) the evidence was insufficient to prove beyond a reasonable doubt his use of force to commit the act or that it was without her consent, and (2) he was denied a fair trial because of improperly admitted evidence and the State's improper closing argument.

The defendant and the victim had apparently never seen each other until they met on a street near the University of Illinois campus in Champaign on March 8, 1979. The victim's version at trial was that shortly after 5 p.m. on that date she was emerging from an alley through which she was passing when defendant stopped her, asked her a question, then pointed a gun at her and told her to go with him, which she did. She stated that at the time she was on the way to her boyfriend's apartment and had some food with her which she was taking there.

Defendant's version was that she approached him initiating a conversation in which they exchanged names and she told him where she lived. He testified that she told him she had a boyfriend who was in Philadelphia and that she was not going anywhere particular at the time. The testimony was undisputed that the two walked together from the place of conversation to an apartment building at the corner of University Avenue and Fifth Streets, also in Champaign. Defendant denied that he had a gun at this time, while the victim maintained that his possession of the gun was the reason that she did not scream or attempt to flee.

The testimony of the subsequent several-hour encounter between defendant and the victim was consistent in most respects. The victim testified that during their encounter she acquiesced in defendant's requests because she was afraid he would become angry and shoot her. No evidence was introduced of any direct threat by defendant after he originally ordered the victim to accompany him. The aggravated kidnapping charge was apparently based upon that original threat, but the jury's acquittal on that charge does not mean that the victim's version of the original meeting of the two must be rejected in considering the sufficiency of the evidence to support the rape conviction. *People v. Dawson* (1975), 60 Ill. 2d 278, 326 N.E.2d 755.

The victim testified that as they entered the apartment at University Avenue and Fifth Street, defendant talked to two men in the hallway and waved his handgun in the air while doing so. They then went upstairs to an apartment where defendant showed her some of his possessions. Defendant testified that while doing this he picked up his gun which was in the apartment and that he did this because he might need it to protect himself from the victim's boyfriends. They soon left and walked to the

apartment of Mark Carter in a building at the corner of Park and Wright Streets. She testified that she also refrained from attempting to escape during this time because of her fear that he would shoot her. Carter was present on their arrival. The victim testified that she and defendant then went into the bedroom for awhile and talked and then came back into the living room where the three of them talked for awhile and smoked some marijuana, which she offered and provided, watched television and listened to music. After awhile defendant and Carter left the room for a short period but she did not try to escape. At some point, she and defendant went into the bedroom and at his direction she took her clothes off and had intercourse with him. Defendant admitted that he had the gun with him at this time but did not point it at her. She testified that she did not know whether he had the gun but did not resist or scream because she thought that he would get the gun and she was afraid he would use it. She said she did not want to have intercourse and did not consent to it. Carter was undisputedly in the living room at this time.

Following the intercourse, the victim and defendant showered together and returned to the living room. As the apartment did not contain sufficient utensils to cook the food she had with her, she and defendant, at her suggestion, walked to a place called "Taco Tico", obtained some food and returned to the apartment where Carter had remained. The three then ate a meal together. Carter left shortly thereafter. Later defendant requested they have intercourse again but she attempted to deter him by saying she was sick. She testified that she delayed him for a little while but, because she did not want to anger him, she went into the bedroom with him again. Then, after he had gone into the living room and changed a record, she suggested that he put another record on and then picked up her clothes and ran naked from the apartment. Defendant testified that she had her clothes on when she ran off. He also testified that while they were out getting the food they both took a "speed" pill.

Complainant gave the following explanation of her flight. Upon leaving the apartment she ran down a street for awhile then tried to gain admittance to (1) a house where nobody was home, and (2) a church which was locked. She then put her clothes on and went to the house of a friend, Greg Benbrook, which was about 15 blocks from the apartment she had just left. Benbrook looked at her and said, "You were raped." She talked to Benbrook for about 15 minutes and then took a shower. She stayed at the apartment that night because she had left the keys to her apartment at the one where the intercourse took place. The next day she went with Benbrook to the Champaign police station. On the day thereafter, items which had been left at the apartment at Park and Wright Street were brought by someone to her apartment. Benbrook confirmed

the complainant's testimony, saying that she had arrived at his apartment at about 10 p.m. on the night of March 8, 1979, without shoes and looking disturbed. He said she nodded when he asked her if she had been raped. He also mentioned that she cried a good deal during the evening.

Carter's testimony was generally consistent with the testimony of both the victim and the defendant as to what took place in his presence. He explained that his apartment was across the hall from that of defendant's girlfriend. Other evidence showed that defendant's handgun was in fact only a replica.

Section 11—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 11—1(a)) provides that for an act of intercourse to constitute rape it must be engaged in "by force" of the male and against the will of the female. Because of the unusual explanation made by the complaining victim in this case, the following statement of the supreme court must be considered:

> "When the charge is forcible rape, the fact that the act of intercourse was performed forcibly and against the will of the complaining witness is a necessary element of the crime which must be proved beyond a reasonable doubt. The degree of force exerted by the defendant and the amount of resistance on the part of the complaining witness are matters that depend upon the facts of the particular case. Thus we have held that resistance is not necessary under circumstances where resistance would be futile and would endanger the life of the female as where the assailant is armed with a deadly weapon, and that proof of physical force is unnecessary if the prosecuting witness was paralyzed by fear or overcome by superior strength of her attacker. [Citation.] It is, however, fundamental that in order to prove the charge of forcible rape there must be evidence to show that the act was committed by force and against the will of the female, and if she has use of her faculties and physical powers, the evidence must show such resistance as will demonstrate that the act was against her will."

*People v. Faulisi* (1962), 25 Ill. 2d 457, 461, 185 N.E.2d 211, 213.

*Faulisi* speaks both to the question of the substantive requirements for an act of intercourse to have taken place "by force" and against the will of the female and also to the question of proof necessary to support a rape conviction when acquiescence by the female might imply her consent and negate her claim of having been raped.

We consider first the question of proof in this case which, in turn, depends upon whether the victim's explanation of her acquiescence was believable. In *People v. DeFrates* (1965), 33 Ill. 2d 190, 210 N.E.2d 467, and *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612, the decisions focused on the question of the believability of the testimony of the

alleged rape victim where her testimony indicated acquiescence by her or little resistance on her part. In both cases the victim's testimony was not corroborated and both convictions were reversed. In *DeFrates*, the accused, a family friend of the complainant, was an electrical repairman called in at night to make repairs. The complainant testified that he had forced her to go into the bedroom and have intercourse with him. Only small children were present in the house at the time. The two remained in the bedroom from 3:45 a.m. until 5:45 a.m. Although he was not shown to be armed, she did not cry out. In *Qualls* after an alleged rape by two men, the complainant admitted that she sat with them in a kitchen while all were naked and drank coffee with them. She then accepted 30¢ bus fare to get home. In *People v. Bain* (1972), 5 Ill. App. 3d 632, 283 N.E.2d 701; *People v. Sparling* (1967), 83 Ill. App. 2d 104, 226 N.E.2d 54; and *People v. Kepler* (1966), 76 Ill. App. 2d 135, 221 N.E.2d 801, rape convictions were reversed because of lack of believability of the prosecution's version of events where there was a lack of showing of resistance and the rapes occurred during a date between the parties or the evidence showed that they later dated.

The instant case differs in at least some respect from each of the foregoing cases because here the victim's testimony was corroborated to some extent, she had not known the defendant before, and defendant's version of the episode was highly unlikely.

Undisputed evidence was introduced that police officers went to defendant's apartment two days after the occurrence and, defendant, seeking to avoid them, fled down a fire escape. He attempted to explain this at trial by saying that he fled to prevent his girlfriend from learning of his having had relations with the victim, but the explanation appears flimsy. Evidence of his flight was evidence of consciousness of guilt on his part (*People v. Seiber* (1979), 76 Ill. App. 3d 9, 394 N.E.2d 1044) and thus circumstantial evidence corroborating the victim's testimony.

In *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288, 291, the court repeated an often-cited rule requiring courts of review to give special attention to the evidence in rape cases but then stated, "But in doing so the court may not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence which was presented. [Citation.]" In the previously cited cases the victim and the defendant usually had some previous relationship which would make consent more likely and the complainant's lack of resistance was more probative of consent because the accused was unarmed. Here, the parties were strangers and the defendant appeared to be armed. The victim's testimony was unusual. However, she was shown to be a college graduate working at the University of Illinois. When she and defendant met she had food in her arms and according to her testimony, she was on her way

to her boyfriend's house. The jury was in a superior position, after hearing the testimony of both of them and seeing them, to determine whether she would likely have then taken up with a stranger and whether her testimony was accurate. The jury was also in a superior position to determine whether defendant's explanation was preposterous. Under *Reese* we should "not encroach" on the jury's function to so determine.

The jury could have found beyond a reasonable doubt that the victim's version of the occurrences was correct.

■■ We thus come to the ultimate question of whether her testimony, if believed, was substantively sufficient to prove rape despite her acquiescence. Unquestionably, she reasonably could have believed the handgun to be real. She also reasonably could have believed that because Mark Carter was a friend of defendant's, seeking his help would have been useless and might have incited defendant to violence. At the time of the intercourse she reasonably could have assumed that resistance would have been futile and would have endangered her life. We do not consider *Faulisi* to hold that acquiescence to intercourse by the female under these circumstances prevents rape from occurring only if the victim's fear paralyzes her. The more controlled fear testified to by the victim here was sufficient to explain her acquiescent attitude. Her testimony was sufficient to prove the substance of the offense of rape.

Defendant's other claims of error do not present serious problems even if the sufficiency of the evidence was considered to be a close question.

■■ The sister of defendant's girlfriend testified on behalf of the State that at about 11 on the night of the alleged rape, defendant came to her apartment and she asked if she could see one of the bullets from his gun. The prosecution then showed the witness one of the bullets from the gun and, over objection, she was permitted to state that defendant told her the bullets "looked powerful, and you know, blow somebody up." This testimony had some probative value to show that the defendant might have thought the replica gun to be real. Also, because the victim testified to having seen the bullets, this testimony would be probative of a belief on her part that the bullets were real. This would bear upon the victim's belief that she was in danger.

■■ A police officer testified to overhearing defendant speaking on the phone to another person after he had been arrested. Evidence was presented that defendant had not then been told who was the purported victim of the rape with which he was charged. The officer explained that, during the phone conversation, defendant explained the charges against him and then after a pause stated, "No, a black girl." The State offered this to show that defendant knew that the charges must have referred to his relation with the victim who was black. This was offered during the

State's case in chief and before he had admitted having intercourse with her and had probative value in showing that he had some connection to the victim. In any event, we do not agree with defendant's contention that the testimony created innuendo that defendant was admitting he had raped the victim. No error resulted from this testimony.

■■ Defendant claimed error arose during closing argument because of the prosecutor's display of defendant's replica handgun and his reference to defendant as being "sick and dumb" and a rapist and an aggravated kidnapper. Defendant argues that display of the gun overemphasized it as evidence in the same manner as reading portions of a trial transcript has been deemed to overemphasize that portion of the evidence. (*People v. Hoggs* (1974), 17 Ill. App. 3d 67, 307 N.E.2d 800.) The record does not show how the gun was displayed, and we find no merit in the contention that the mere display of an exhibit unfairly overemphasizes that portion of the evidence. As each characterization the prosecutor made of the defendant had some support in the evidence, no error of substance resulted from their use. *People v. Stephens* (1955), 6 Ill. 2d 257, 128 N.E.2d 731.

We affirm.

Affirmed.

MILLS, P. J., and WEBBER, J., concur.