SECOND DIVISION 
 February 11, 1997







No. 1-94-2902

THE PEOPLE OF THE STATE OF ILLINOIS, ) Appeal from the of
 ) Circuit Court 
 Plaintiff-Appellee, ) Cook County.
 )
 v. )
 ) 
CHRISTOPHER BABBINGTON, ) Honorable
 ) Bertina Lampkin,
 Defendant-Appellant. ) Judge Presiding.

 JUSTICE McNULTY delivered the opinion of the court:

 After a jury trial, defendant Christopher Babbington was found
guilty of second degree murder and aggravated battery with a
firearm and sentenced to two 14-year terms, to run concurrently. 
Defendant appeals, contending that: (1) the evidence was
insufficient to rebut his claim of self-defense; (2) he was
improperly convicted by a panel of 13 jurors when an alternate
juror participated in deliberations; (3) the trial court erred in
excluding defendant s prior consistent statement describing the
decedent s gun; (4) the trial court erred in excluding evidence
that the decedent's gun was not registered in Illinois; (5) the
trial court violated defendant s right to a public trial when it
excluded an acquitted defendant from the courtroom; (6) the trial
court improperly admitted information about the decedent s
background into evidence; and (7) the trial court admitted
inadmissible hearsay statements made by the decedent. We reverse
and remand.
 Qadree El-Amin testified that he was the assistant road
manager of the singing group Boyz II Men. El-Amin was in charge of
security for the group. Roderick Khalil Roundtree, the decedent,
was the group s road manager. From May 23 to May 25, 1992, Boys II
Men and their entourage and other musical groups and their
entourages were staying at the Guest Quarters Hotel in Chicago. 
 At 5 a.m. on May 25, 1992, El-Amin and his girlfriend, Alisa
Watson, were asleep in a room on the twenty-sixth floor of the
hotel, one floor below the decedent s suite, when they were
awakened by the deceased screaming El-Amin s name. El-Amin
testified that the decedent sounded scared. El-Amin told Watson
to call security as well as two friends employed as security for
the band. El-Amin quickly dressed and ran into the hallway. When
El-Amin entered the hallway, he saw the decedent standing half on
and half off one of the elevators. El-Amin saw defendant, Kenneth
Copeland and Christopher Foley inside the elevator. El-Amin
testified that defendant was wearing an expression like "nothing is
happening." The decedent appeared to be scared and said, "[T]hese
guys was [sic] trying to break in my room, what do you all want,
what do you all want?" El-Amin said, "Let s take em downstairs
to security." El-Amin stepped into the elevator. As the doors
closed, defendant s expression changed "to more of a suspicious-
type person." El-Amin testified that the defendant and the other
two men charged at him and the decedent. During the ensuing
scuffle, El-Amin saw sparks fly from defendant s direction and
heard three gunshots, but did not see a gun. The elevator door
opened on the twenty-sixth floor, and defendant and the two other
men ran out. El-Amin saw what appeared to be burn marks on the
decedent s forehead and bare chest. El-Amin then went to his room
and told his girlfriend to call security. El-Amin then headed for
the lobby, taking a different elevator. El-Amin then noticed that
he had been shot in the knee. 
 El-Amin picked defendant, Copeland and Foley out of a line up. 
He indicated that the gunshots came from the left side of the
elevator, where defendant was standing. 
 El-Amin s girlfriend, Alisa Watson, testified that she was
asleep in El-Amin s hotel room when she heard the decedent yelling
for El-Amin. She testified that the decedent sounded scared, like
he needed help. Watson heard the decedent yell, "[T]here are three
motherfuckers out here on me." 
 Jeanetta Maddox testified that she was with the decedent in
his hotel suite when they were awakened at 5 a.m. by voices in the
hallway. The decedent went to the door and spoke to someone in the
hallway. A few seconds later, the decedent left the room. Moments
later, she heard El-Amin's name called, followed by gunshots. 
 Craig Brooks testified that he was the road manager for the
musical group Hammer and was staying in a suite on the twenty-
seventh floor of the hotel, when at 5 a.m., he was awakened by a
knock at the door. Defendant, Copeland and Foley were at the door,
and they asked Brooks where the party, Hammer and the girls were. 
Brooks told them that they missed the party and that if they did
not see the girls downstairs, the girls must have left. Brooks
testified that the men did not appear to be causing problems. Five
minutes later, Brooks was told that the decedent's body had been
discovered in the elevator. 
 Hotel security guard Glenda DeBerry testified that on May 25,
1992, she was working the night shift in the lobby, when at 5 a.m.,
she received a telephone call from a room on the twenty-seventh
floor, complaining of noise in the hallway and requesting that she
ask the people to keep it down. Heading toward the elevators, she
met El-Amin in the lobby and he reported the shooting of the
decedent. El-Amin asked her not to call the police, because he and
his friends would "handle it." El-Amin told her that he had also
been shot and then passed out. Deberry then directed the night
auditor to call the police, who arrived in 10 minutes. Deberry
walked toward the elevators and saw defendant walk quickly out of
the staircase. She did not notice any injuries on defendant. 
 Leslie Beauzial testified that she and defendant work for
Standard Parking Corporation, parking cars at the hotel. Beauzial
testified that, at 4 a.m., defendant and two friends arrived at the
hotel, left their car in front of the hotel, and entered the hotel
lobby. Deberry also saw defendant and his friends return to the
car and drive away at a medium fast speed. 
 Don Stewart, director of security for the hotel, testified
that the hotel has a strict policy forbidding employees from being
on hotel property when they are off duty. 
 Adrien Norfleet, a dancer with the musical group Hammer,
testified that he was in a room on the twenty-seventh floor of the
hotel when he looked out into the hallway and saw three neatly
dressed men, whom he identified as defendant, Copeland, and Foley. 
Soon thereafter, he heard loud talking in the hallway, so he opened
his door and saw the decedent escorting the three men to the
elevator. Norfleet looked down the elevator shaft and saw the
decedent attempting to stop the elevator door from closing on the
twenty-sixth floor. He summoned security, but when he returned, he
heard three gunshots and the sound of footsteps. Norfleet saw the
decedent s body when it came up in the elevator to the twenty-
seventh floor and noticed that there was a gun protruding from the
left pocket of the decedent's shorts. 
 Sonya Parks testified that she was in Norfleet's hotel room
when she heard people knocking on doors in the hallway. She looked
out and saw defendant, Copeland and Foley. Later, when she saw the
decedent's body in the elevator, she saw a gun handle and part of
a gun sticking out of the decedent s pocket. 
 Officer Patrick Moran testified that, at 5 a.m. on May 25,
1992, he went to the twenty-seventh floor of the Guest Quarters
Hotel in Chicago and saw a large black male lying dead on the floor
of the elevator, which had been stopped with the doors open. In
the elevator were five assorted garment buttons. On the floor near
the elevator door was a pistol. He lifted a fingerprint from a
drinking glass that was recovered in the elevator and found that it
matched Foley's print. 
 Detective Baldree testified that on May 28, 1992, he went to
Foley's home, after Foley was in custody. Foley's mother directed
the detective to a rear porch, where he recovered a .38-caliber
handgun inside a video cassette recorder. A firearms expert
testified that, in his opinion, a bullet recovered from the
decedent's body was fired from that gun. A second bullet removed
from the decedent's body and the bullet recovered from El-Amin's
knee were consistent with the gun recovered from Foley's home, but
were too mutilated for comparison. In the expert's opinion, the
gun had been fired three times and could not be discharged without
pulling the trigger. The other pistol, which had been recovered
from the decedent's pocket, was a .38 semi-automatic which the
expert determined had not been fired. 
 The medical examiner testified the decedent s death was caused
by two gunshot wounds. A bullet wound to the decedent's right
shoulder was surrounded by stippling, which indicated close-range
firing. The decedent's blood tested negative for opiates, alcohol,
and a cocaine derivative. The decedent was 6 feet 3 inches tall
and weighed 322 pounds.
 Detective Zuley testified that on June 4, 1992, Foley's mother
handed him two shirts and two coats inside a trash bag. Foley's
mother identified the clothes as belonging to defendant, Foley, and
Copeland. A trace-evidence analyst testified that he examined the
clothes. The shirts belonging to defendant and Foley were missing
buttons that matched buttons recovered from the elevator. Missing
from Copeland's jacket was a metallic strap matching one recovered
from the elevator. All of the clothing had been damaged in an
apparent struggle, but there was no major damage to defendant's
shirt. Defendant's jacket had two soot marks on the inside, a
perforation near the waistband, and two smudge marks on the outside
that tested positive for lead. The expert determined that the
marks indicated that a pistol had been discharged from within
defendant's jacket.
 Paramedic Randall Anderson testified that, while tending to
the decedent's body, he felt the gun in the pocket of the
decedent's shorts and removed it while checking for vital signs.
 Defendant testified in his defense that he is in the ready
reserves of the Army National Guard after completing active duty. 
On the day of the incident, he worked parking cars at the Guest
Quarters Hotel from 11 a.m. to 7 p.m. as scheduled. After work, he
met with Copeland and Foley and visited several nightclubs. In the
early morning hours, they returned the hotel to check the posted
schedule to see if defendant had to work the next morning and to
see if the musical groups staying there were having a party, since
they were hoping to find some women. The parking attendant on duty
allowed them to park their car in front of the hotel. Defendant
testified that he walked into the attendant's booth and checked the
work schedule, and then entered the lobby with his friends. 
Defendant, Copeland and Foley rode the elevator to the twenty-sixth
floor, where they thought some women had gone. The men were
intoxicated and knocking on doors. When nobody answered, they went
to the twenty-seventh floor. After getting no information on a
party from either Sonya Parks or Craig Brooks, defendant knocked on
the decedent's door. The decedent was very angry and upset at
being disturbed. The decedent was hollering and swearing in the
doorway, and then he stepped back into the suite and told the men
to wait and threatened them, telling them not to leave. Defendant,
Copeland and Foley walked to the elevator. While waiting for the
elevator, defendant asked Copeland for the gun, because he believed
that the decedent might be telephoning authorities and that, as a
hotel employee, defendant would be less likely to get in trouble
for possessing the gun. Copeland handed defendant the gun. 
Defendant concealed the gun on his person. Defendant acknowledged
that he was not supposed to be in the hotel and could have lost his
job if he was caught in the hotel. 
 Defendant testified that the elevator doors were closing
behind them when the decedent stopped the doors with his arm. The
decedent was holding a gun when he stepped into the elevator. The
decedent yelled profanities while he asked the men what they were
doing there. The decedent then began pistol whipping the three of
them. The decedent struck defendant with the handgun several times
across the nose, lip and back of the head. Defendant's nose and
lip were bleeding. 
 The elevator stopped one floor below. The decedent was
keeping the elevator doors from closing and was calling someone's
name. Qadree El-Amin entered the elevator and began punching the
three men and tried with the decedent to pull the men off of the
elevator. The three men were crouched near the floor attempting to
deflect the blows. Defendant emerged from the crouched position
and fired Foley's gun while the decedent was on top of him and was
swinging at defendant's head with the pistol butt. Defendant
testified that his shooting was sporadic and not aimed. Defendant
testified that up until that moment, he had left the handgun in his
pocket and he took it out and fired it because he was afraid and
did not know how many more times the decedent would strike him with
the gun or what subsequent violence was in store for him. 
 After the gunfire, defendant and his friends ran off the
elevator and went down the stairway to the lobby. Defendant was
arrested at his home later that day. Defendant admitted at trial
that he lied to police when he claimed that El-Amin had fired the
fatal shots.
 The jury found defendant guilty of second degree murder and
aggravated battery with a firearm, and the trial court sentenced
defendant to two 14-year terms, to run concurrently.
 We first address defendant's contention that the evidence at
trial was insufficient to rebut his self-defense claim. Self-
defense is an affirmative defense and, therefore, once raised, the
State has the burden of proving beyond a reasonable doubt that the
defendant did not act in self-defense, in addition to proving the
other elements of the offense beyond a reasonable doubt. People v.
Seiber, 76 Ill. App. 3d 9, 394 N.E.2d 1044 (1979). The elements of
self-defense are: (1) that force is threatened against a person;
(2) that the person threatened is not the aggressor; (3) that the
danger of harm is imminent; (4) that the force threatened was
unlawful; (5) that the person threatened must actually believe that
a danger exists and that the kind of force he uses is necessary;
and (6) that such beliefs are reasonable. People v. Balfour, 148
Ill. App. 3d 215, 498 N.E.2d 547 (1986). When a trier of fact
determines that the evidence presented at trial negates the
existence of any one of these elements beyond a reasonable doubt,
the State has carried its burden. People v. Harmon, 200 Ill. App.
3d 411, 558 N.E.2d 173 (1990).
 While defendant claims that he shot the decedent in order to
stop decedent from pistol whipping him, several witnesses testified
that the pistol was found in the decedent's pocket, not his hand. 
Furthermore, although the evidence technician testified that he
found the decedent's gun near the elevator door, a police officer
who arrived at the scene before the technician testified that he
removed the gun from the decedent's pocket and placed it near the
door. This evidence was sufficient for a jury to find that the
State carried its burden in demonstrating that the decedent
presented no imminent threat to defendant and that defendant had no
reasonable belief that any danger existed that would require the
use of deadly force. 
 Defendant's next contention is that his convictions must be
reversed since he was tried by 13 jurors. Defendant claims that
although the trial judge dismissed the three alternate jurors prior
to deliberations, alternate juror Loutitia Smith deliberated with
the jury, stayed overnight in the hotel with the sequestered
jurors, signed the verdict forms the next day, and responded when
the jury was polled. 
 The record reveals that, prior to deliberations, the trial
judge excused alternate juror Smith, along with the other
alternates, telling them that because all the regular jurors were
healthy and able to stay through the trial, the alternates would
not be deliberating on the case. The trial judge informed the
alternates that they could remain in the courtroom and speak with
the judge after the jury retired to the jury room. The trial judge
then informed the alternates that, if they had anything in the jury
room, they should go into the jury room for a few minutes before
the jury entered and remove those items. The trial judge then told
the alternates to take seats in the front row while the jurors
retired to jury room. 
 When the jury did not reach its verdict after several hours of
deliberating, it was sequestered overnight and reached its verdict
the following morning. There were 12 signatures on each of the two
verdict forms returned by the jury. Alternate juror Smith signed
the verdict forms, while regular juror Willie Nunn did not. When
the trial court polled the jury, the trial transcript shows that 13
jurors, including regular juror Willie Nunn and alternate juror
Loutitia Smith, assented orally. 
 Defendant raises for the first time, in his appellate brief,
his claim that he was denied a fair trial since 13 jurors, one an
alternate who had been excused prior to deliberations, deliberated
on this case. While this appeal was pending, the State filed a
motion to amend the record with a replacement transcript. The
State claimed in its motion that the court reporter, as verified by
her affidavit, made a typographical error in transcribing the
polling of the jury and that only 12 jurors were actually polled. 
The State's motion claims that regular juror Nunn did not respond
to the polling, but does not deny that dismissed alternate juror
Smith did respond. Defendant objected to this proposed amendment
and submitted an affidavit from defense counsel, stating that the
court reporter informed counsel that she now believes that she did
not make an error in transcribing the polling of the jurors and
believes that 13 jurors, the 12 regular jurors and alternate juror
Smith, were polled. The State's motion to amend the record and
defendant's objections were ordered taken with the case. 
 We deny the State's motion to amend the record. Regardless of
whether 12 or 13 jurors responded to the polling, it is undisputed
that excused alternate juror Smith deliberated with the jury and
signed the verdict forms. The amended transcript is therefore not
necessary in order to resolve the issue of whether defendant was
prejudiced by Smith's participation in the deliberations. 
 The State claims that defendant waived his objection to the
participation of the alternate juror by failing to notice the
alternate s participation and object to such when the verdict was
returned, and in failing to raise the matter in his post-trial
motion for a new trial. In support of this argument, the State
relies on People v. Escobedo, 151 Ill. App. 3d 69, 502 N.E.2d 1263
(1986), and People v. Patterson, 163 Ill. App. 3d 370, 516 N.E.2d
642 (1987). In Escobedo, the defendant claimed that his
convictions were vitiated when a prospective juror whom defendant
had peremptorily challenged, and whom the trial court had excused
during voir dire, served on the jury, which found defendant guilty. 
The defendant claimed that he and his attorneys were not aware of
the juror's participation until the record on appeal was reviewed. 
The court noted that defendant and his attorney had an opportunity
to view the excused juror as she participated in the jury's hearing
of the evidence at trial. The court found that defendant had a duty
to advise the court of any infirmity in the jury as sworn at the
earliest opportunity. By failing to recognize and call to the
court's attention the fact that a juror who was challenged and
excused was in fact in service upon the jury, defendant waived this
issue for purposes of appeal.
 In Patterson, a prospective juror who had been peremptorily
challenged by the State and excused by the trial court signed the
verdict form finding defendant guilty. The court found that
defendant waived the right to argue that the integrity of his trial
had been jeopardized by the participation of the excused juror,
since he never objected to the composition of the jury at any time
during trial or jury deliberations, never objected to the juror s
presence at the return of the verdict or at the polling of the
jury, and failed to raise the matter in his motion for a new trial.
 In Escobedo and Patterson, the excused juror s participation
on the jury occurred at the commencement of trial and continued
throughout the trial. Thus, defendant and his counsel had ample
opportunity to notice that the excused juror was sitting on the
jury and to bring this error to the attention of the court. Here,
however, juror Smith served as an alternate throughout trial and
was unequivocally excused when deliberations began. Any
impropriety concerning Smith did not occur until deliberations
began, when Smith either participated in deliberations in addition
to a regular juror or instead of a regular juror. Defendant and
his counsel would have had only a brief opportunity to notice
Smith's participation on the jury after the verdict was returned
and the jury was polled. During these few minutes nobody, not even
the court or the State, noticed the alternate juror s
participation. Under these circumstances, we find no waiver based
on defendant s failure to object to Smith s participation in
deliberations. Furthermore, although defendant did not raise any
issue regarding Smith s participation in his post-trial motion, we
believe this is an issue of plain error. See United States v.
Olano, 507 U.S. 725, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993). 
 It is clear that alternate juror Smith was excused by the
trial court and told that she would not be deliberating with the
jury. It is also clear that Smith somehow ended up deliberating
with the regular jurors since she signed the verdict forms and
responded to the polling of the jurors. What is not clear,
however, is whether she deliberated instead of one of the regular
juror or in addition to the 12 regular jurors. Either scenario
would have caused defendant prejudice.
 If alternate juror Smith deliberated instead of regular juror
Nunn, this arrangement probably resulted from a collusion between
Smith and Nunn. The change in jurors occurred without the
knowledge or consent of defendant, or even the State or the court. 
This was certainly prejudicial to defendant, since a defendant has
a right to know the composition of the jury that will be
deliberating on his case. 
 The other possible scenario is that defendant was tried by 13
jurors, alternate juror Smith and the 12 regular jurors. In the
few cases that address the presence of alternate jurors during
deliberations, the courts considered whether the defendants were
prejudiced when the trial courts violated the federal rule
requiring alternates to be dismissed after the jury retires to
deliberate. In Olano, two alternate jurors were permitted to
retire with the jury, but were instructed by the trial court not to
participate in the deliberations. Defendant failed to object to
the presence of the alternates. Applying the plain error standard,
the Court stated that the presence of the alternative jurors during
deliberations, although a violation of Federal Rules of Criminal
Procedure, would only affect defendant's substantial rights if
prejudicial impact were shown. The Supreme Court noted that the
presence of alternate jurors during deliberations might prejudice
the defendant if the alternates actually participated in
deliberations either verbally or through body language, or because
the presence of the alternates had a chilling effect on the regular
jurors. The Court found that defendant made no showing that the
alternate jurors either participated in the jury's verdict or
chilled deliberations by regular jurors and it must be presumed
that the alternates followed the trial court's instructions and did
not participate in deliberations. 
 In United States v. Ottersberg, 76 F.3d 137 (7th Cir. 1996),
when the jury retired for deliberations, the court permitted the
two alternates to retire with the jury to deliberate. Defendant
never objected. The alternates were given no instructions that
they were not to deliberate with the regular jurors. When the
verdict forms was returned with only 12 signatures, the trial court
noted that the alternates had deliberated along with the rest of
the jurors and instructed the entire jury to retire with the
alternates to allow the alternates to sign the verdict forms. The
seventh circuit found that prejudice occurred since, assuming the
jurors followed the court's instructions, the alternates
deliberated with the regular jurors and reached a unanimous
verdict. Furthermore, to find that the alternates did not
participate would require the ludicrous presumption that the
alternates sat mute in the jury room for 9« hours. The court found
that allowing defendant's verdict to stand would seriously affect
the fairness and integrity of the proceedings.
 In United States v. Houlihan, 92 F.3d 1271 (1st Cir. 1996),
despite defendant's objections, the trial court refused to
discharge the alternate jurors once delibera