THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CAROLINE M. SCOTT, Defendant-Appellant.

Third District   No. 80-539

Opinion filed July 10, 1981.

900

Robert Agostinelli and G. Joseph Weller, both of State Appellate Defender's Office, of Ottawa, for appellant.

L. Patrick Power, State's Attorney, of Kankakee (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Following a jury trial in the circuit court of Kankakee County, defendant Caroline M. Scott was convicted of the murder of Arthur Lee (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(2)). She was subsequently sentenced to the Department of Corrections for a term of 20 years. On

appeal she raises a number of issues for our consideration, including allegations of judicial misconduct, but because of our disposition of this case we need discuss only two: whether the trial court erred in refusing to give to the jury a tendered instruction on self-defense (Ill. Rev. Stat. 1979, ch. 38, par. 7—1); and whether the trial court erred in refusing to give to the jury a tendered instruction on voluntry manslaughter (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b)).

The record in this case paints a pathetic, depressing picture of a mentally and physically abused young woman who suffered greatly at the hands of a brutal man for whom she bore three children. It would serve no useful purpose to recite in any detail the dismal litany of frequent and severe beatings administered by Arthur Lee to the defendant over the eight-year period they lived together. As a consequence, we will begin our analysis of the issues presented with a shortened statement of the events occurring the early morning hours of November 12, 1979, the last day of Arthur Lee's life.

Sometime after 9 p.m. on November 11, 1979, after she retired, the defendant heard a knock on the front door of the Kankakee home she shared with Lee and her five children. Pursuant to Lee's order that she never answer the door to their home unarmed, Scott armed herself with Lee's .357 magnum and went to the door. Upon ascertaining that Lee was outside, she opened the door and let him into the house. However, Scott noticed at this time that he appeared "strange." Tests subsequently performed on Lee's blood revealed an alcohol content of .270 grams of ethanol per 100 milliliters, which is indicative of an advanced degree of intoxication. Scott asked Lee what was wrong, and in response he pushed her. He then began to accuse her of having sexual relations with a man named "Slim" during the eight years he had lived with her. This was not the first time Lee had accused Scott of having sexual relations with other men. On previous occasions he accused her of having sex with her landlord and Lee's brother, and on each of these ocasions the accusation was followed by a severe beating. One confrontation culminated with Lee throwing Scott, who was pregnant at the time, down a flight of stairs.

While Lee accused Scott of having an affair with "Slim," he removed a 9-mm. gun from a clip on his pants and struck her across the face with it. Lee was armed at the time because he was employed as a correctional officer at the Kankakee County jail. After taking the .357 from Scott's hands and throwing it on their bed, he struck the defendant twice more with the 9-mm. gun, and several times with his fists. He then proceeded to make a telephone call to a woman named "Bonnie." Scott overheard Lee tell Bonnie that Scott would be gone in 45 minutes.

After overhearing part of the telephone conversation, Scott walked around the inside of the house, and tried to think of a way to leave the

house with her youngest son without drawing Lee's attention. When asked by defense counsel why she was so concerned about leaving the house, Scott replied "[b]ecause Arthur told me before the night was over that I was going to tell him everything or else." Defense counsel then inquired "What did you based upon past experience take him to mean by that statement?" To this question Scott replied "I was frightened that he was going to hurt me real bad, possible even kill me if I wouldn't confess [*sic*]."

After searching in vain for a way to get out of the house unnoticed, Scott returned to her room and sat on the bed. From where she was sitting she could observe Lee, who was still sitting down and talking on the telephone. Lee then motioned to her to get his handcuffs by tapping his wrist. The record reveals that oftentimes Lee would handcuff Scott before administering a beating. However, instead of getting the handcuffs she picked up the .357 magnum from the bed. "I became frightened of what Arthur was going to do to me so I turned, I picked up the gun off the bed. I closed my eyes and fired it. I tried to fire once to scare him but the gun continued shooting to [*sic*] I heard it click over and over."

Scott fired the .357 magnum six times. Lee, who was approximately four feet away and apparently still sitting when shot, was struck at least four times. One wound was certainly lethal, and two other wounds could have been fatal as well. Lee was dead within several seconds. At the trial, the defendant stated she did not know how much time elapsed between the time Lee first struck her and when she shot him, but estimated it not to be longer than one hour.

■■ The first issue raised by the defendant is whether the trial court erred in refusing to instruct the jury on self-defense. Section 7—1 of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 7—1) provides:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against each other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

"A self-defense instruction is given in a homicide case when there is some evidence in the record which, if believed by a jury, would support a claim of self-defense." (*People v. Lockett* (1980), 82 Ill. 2d 546, 551, 413 N.E.2d 378, 381.) In order to support the giving of the instruction, there must be some evidence in the record revealing a subjective belief on the part of the defendant that the use of deadly force was necessary to prevent imminent death or great bodily harm. (*Lockett*; IPI Criminal No. 24.06.)

This court has previously held that "slight evidence of self-defense" will support the giving of the instruction. *People v. Sunquist* (1977), 55 Ill. App. 3d 263, 266, 370 N.E.2d 864, 867; *cf. People v. Adock* (1975), 29 Ill. App. 3d 917, 331 N.E.2d 917 (compulsion).

■■ Although this is admittedly a very close case, we believe that it must be decided in favor of the defendant. The record contains sufficient evidence of defendant's subjective belief of the necessity of the use of force likely to cause death or great bodily harm to warrant the giving of a self-defense instruction. Scott testified that the night she killed Arthur Lee she "was frightened that he was going to hurt me real bad, even kill me * * *," and that she picked up the .357 rather than complying with his demand of her to be handcuffed and began shooting because "I became frightened of what Arthur was going to do to me * * *." She obviously maintained a subjective belief that deadly force was necessary to deter the decedent from causing her great bodily harm and possibly death. Whether this subjective belief was reasonable in light of all of the surrounding facts is a question for the jury. "So long as some evidence is presented from which a jury could conclude that defendant had a subjective belief, the jury should determine if the belief existed and, if so, whether that belief was reasonable or unreasonable." (*Lockett*, 82 Ill. 2d 546, 553, 413 N.E.2d 378, 381.) Consequently, we believe that the tendered self-defense instruction should have been given, and it was reversible error for the trial court not to do so.

■■ For these same reasons, we also conclude that it was error for the trial court to refuse to give the jury a voluntary manslaughter instruction. "[A] self-defense *and* a voluntary manslaughter instruction should be given when any evidence is presented showing the defendant's subjective belief that use of force was necessary." (Emphasis added.) (*Lockett*, 82 Ill. 2d 546, 552, 413 N.E.2d 378, 381; accord, *People v. Glass* (1981), 94 Ill. App. 3d 69, 418 N.E.2d 454; *People v. Smith* (1981), 94 Ill. App. 3d 969, 419 N.E.2d 404.) The same subjective belief that supported the self-defense instruction will support the voluntary manslaughter instruction (IPI Criminal No. 7.05). The difference between self-defense and voluntary manslaughter is in the reasonableness of the defendant's subjective belief. If reasonable, then a jury is justified in finding the defendant acted in self-defense. If unreasonable, the jury is justified in returning a verdict of voluntary manslaughter. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2(b); see *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756.) Naturally, the jury is not limited in returning a verdict of either self-defense or voluntary manslaughter. If it concludes that the defendant did not have a subjective belief that use of deadly force is necessary, it may return a verdict of murder. However, under these facts the jury should have been given an alternative other than murder or not guilty.

For the foregoing reasons, we reverse the judgment of the circuit court of Kankakee County, and remand for a new trial.

Reversed and remanded.

SCOTT, P. J., and ALLOY, J., concur.