THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LAVIN BALFOUR, Defendant-Appellant.

First District (3rd Division) No. 83—387

Opinion filed September 3, 1986.

Dennis M. Doherty, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jeanette Sublett, and Mark L. Le Fevour, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE RIZZI delivered the opinion of the court:
Following a bench trial, defendant, Lavin Balfour, was convicted of murder and sentenced to 30 years in the Department of Corrections. On appeal defendant argues (1) the evidence is insufficient to sustain a finding of guilty of murder; (2) the trial court improperly denied a request for a behavioral-clinic examination made by defendant at his sentencing hearing; (3) defendant was denied effective assistance of counsel; and (4) defendant was denied due process of law when the police "misplaced" photographs taken at the police station which showed defendant reenacting his encounter with the victim. We affirm.

On June 4, 1981, around 3:30 p.m., the victim, Robert Rodgers, defendant and some other men were in the alley behind 15203 Wood

Street in Harvey. Defendant and Rodgers became involved in an argument. The two men moved down the alley, where a fight erupted. When Rodgers fell to the ground, defendant kicked and stomped him repeatedly. Rodgers was taken to a hospital for treatment, but he died that evening as a result of the injuries inflicted by defendant.

Defendant first argues that the evidence does not support his murder conviction. We disagree.

At trial, Herbert Cooper testified that he is married to the victim's mother-in-law. He stated that at the time of the incident, he and his friend, Rudolph Terrell, were repairing cars by the alley behind where Terrell lived, 15203 Wood Street. Approximately five to six people were present. Defendant, whom Cooper had known for more than 20 years, drove into the alley. Defendant approached Cooper and asked him who owned the house. Cooper told him that Terrell owned the house, and defendant went and spoke to Terrell.

Rudolph Terrell testified that while he was working on a car, defendant came over and asked whether he needed a roof. Defendant stated that he could have it for "a deal." Terrell said that he was not interested. Rodgers came up and said to defendant, "[W]hat you doing around here selling hot stuff." Rodgers further told defendant that he did not want the police "worrying us *** about stuff stolen, didn't need that stuff in the neighborhood" and that defendant should take his stuff and leave. According to Terrell, defendant and Rodgers then moved off, and he went back to work on the car.

Cooper and Terrell gave similar accounts of the events that followed. They heard shouts, jumped up and looked down the alley. Cooper testified that he saw defendant swing at Rodgers, and that Rodgers fell and did not move. Terrell stated that he saw defendant hit Rodgers in the head with a piece of asphalt. Rodgers fell and remained still. Both witnesses testified that defendant then started off, but turned and came back and started kicking and stomping Rodgers in the head and chest. As these witnesses ran to Rodgers' aid, defendant ran past them and the other people in the alley to his car and drove away. Cooper and Terrell both testified that they never saw anything in Rodgers' hands, never saw Rodgers strike defendant, and never heard Rodgers threaten defendant. Both witnesses also testified that they did not see Rodgers drinking that afternoon.

Another State witness, Carl Douglas, testified that when he drove into the alley, he saw Rodgers being beaten. Defendant had a piece of asphalt in his hand. Defendant delivered blows to Rodgers' head, and then kicked and stomped him after he went down.

Robert Stein, the chief medical examiner of the Cook County medi-

cal examiner's office, gave testimony regarding the autopsy that he performed on Rodgers. According to Stein, Rodgers' head injuries could have been caused by a rock, a brick or asphalt. He did not observe any broken bones. The pancreas was lacerated, and there were numerous huge lacerations of the liver. The cause of death was traumatic laceration of the liver in association with trauma. The parties stipulated that if Dr. Michael I. Schaffer of the medical examiner's office were called to testify, he would state that the victim's blood amount of alcohol was 131 milligrams percent.

The State's final witness, Officer William Watson, testified that he responded to a radio transmission around 3:40 p.m. on June 4, 1981. He found a man lying just off the alley between Page and Wood Streets, behind 15220 Page. The man's face was bruised and had several small cuts. The officer stated that he did not see anything in the man's hands. He described the victim as being 32 years old, approximately 6 feet 1 inch tall, and weighing 170 pounds. The officer further testified that he arrested defendant approximately two to three hours after the incident. He described defendant as 31 years old, 5 feet 9 inches tall, and weighing 190 pounds. Defendant did not struggle when he was arrested. The officer recalled that defendant was subsequently taken to the hospital for treatment of a hand injury.

Defendant called Barbara Emery as a witness. Emery testified that she lived in a second-floor apartment at 15220 Page Street. At the time of the occurrence, her attention was drawn to the alley when she heard defendant and Rodgers yelling at each other in angry tones. When she looked out her window, she saw Rodgers chasing defendant down the alley towards her building. Rodgers had one hand behind his back. According to Emery, Rodgers slid on some rocks. She did not see anything in his hands at this time. When Rodgers fell, defendant started to run away. Defendant then turned and came back. He kicked and stomped Rodgers and jumped up and down on top of him before running away. Emery called the paramedics and the police and then came down to ground level. She did not approach Rodgers, but she was able to see little rocks, similar to the ones in the pavement of the alley, in Rodgers' hand.

During cross-examination, Emery stated that she had known defendant for approximately two years. She met him through a friend of hers who was defendant's girlfriend. Emery admitted that she never talked to anyone about the fight until the week before she testified.

Defendant testified that on June 4, 1981, he went to 15203 Wood Street to see the owner of the property. He parked in the alley be-

tween Wood and Page. There, he saw Herbie Cooper, whom he knew, and approximately 10 other people, including the victim, standing around drinking whiskey. After Cooper informed defendant that Terrell owned the property, defendant spoke to Terrell about putting some roofing material on his house. Terrell stated that he did not own the house but that he would get defendant the owner's name and address. While they were talking, Rodgers came over and told Terrell that he did not have to explain anything to defendant. Defendant told Rodgers that he did not know him, but Rodgers insisted that he did. Defendant smelled whiskey on Rodgers' breath and believed him to be intoxicated. Rodgers told defendant that he did not want "his kind" in the neighborhood. Defendant, who is black, explained that he looked hispanic at the time due to his long hair. All of the other men in the alley were black. At this point, defendant stated, he became afraid because he thought that Rodgers might do something to him, and the other men were Rodgers' friends. Defendant described Rodgers' mood as violent and hostile.

Defendant further testified that Rodgers told him to step out to the alley to settle things. Fearing that something was "going to go down," defendant told Terrell that he was leaving and would speak with him later. Rodgers, however, was standing by defendant's car and started approaching defendant with his right hand in his back right pocket. Three or four of the other men came near. Feeling threatened, defendant backed away from his car. Rodgers then stated that he was "going to get" defendant. Defendant made no reply to this statement.

Thereafter, defendant stated, he backed into a parked car, and he told Rodgers that he did not want to fight. Rodgers then hit him in the face with his fist. Defendant did not fight back because Rodgers had his hand in his pocket and defendant feared that he had a weapon. When no one came to defendant's aid, defendant turned and started walking quickly away from Rodgers, but Rodgers continued to threaten him. When defendant reached the parking area behind 15220 Page Street, he turned and saw Rodgers pick up a small piece of asphalt, so he did likewise. Defendant testified that Rodgers then lunged at him, and he tried to hit Rodgers. Both men missed. Defendant pulled Rodgers' t-shirt over Rodgers' head and punched him in the head, thereby injuring his hand. As they continued to wrestle, defendant flipped Rodgers onto his back.

Defendant stated that when Rodgers fell he started to reach for his back pocket, and defendant again thought that he was going for a weapon. Defendant stated that he was not armed so he started kicking Rodgers in self-defense. Defendant averred that he did not intend to

cause serious harm or injury and that any kicks to Rodgers' head were inadvertent. Defendant denied stomping the victim. According to defendant, as he ran to his car after the fight, the other men in the alley threatened him and tried to grab him.

■■ In contending that the evidence was not sufficient to find him guilty beyond a reasonable doubt, defendant initially argues that his version of the circumstances was not improbable, nor was it impeached. Defendant's sole support for this contention is the fact that none of the State's witnesses saw how the fight started. Cooper and Terrell both testified that they were working on a car at the time, and Douglas testified that the fight had already started when he pulled into the alley. We do not believe, however, that the State's inability to present evidence concerning how the fight began, in and of itself, vitiates defendant's murder conviction.

■■ Defendant further argues that his murder conviction must be reversed because the evidence showed that he acted in self-defense. The general rule as to defense of the person is set forth in section 7—1 of the Criminal Code of 1961:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." (Ill. Rev. State. 1979, ch. 38, par. 7—1.)

A defense of justifiable use of force is an affirmative defense (Ill. Rev. Stat. 1979, ch. 38, par. 7—14), and therefore, once the issue is raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the other elements of the offense beyond a reasonable doubt (Ill. Rev. Stat. 1979, ch. 38 par. 3—2; *People v. Seiber* (1979), 76 Ill. App. 3d 9, 13, 394 N.E.2d 1044, 1048).

■■ ■ The use of deadly force in defense of the person is justified where (1) force is threatened against the person, (2) the person threatened is not the aggressor, (3) the danger of harm is imminent, (4) the force threatened is unlawful and (5) the person threatened actually believes that a danger exists, that the use of force is necessary to avert the danger, that the kind and amount of force used are necessary and that such beliefs are reasonable. (*People v. Kyles* (1980), 91 Ill. App. 3d 1019, 1021, 415 N.E.2d 499, 501; *People v. Brumbeloe* (1968), 97 Ill.

App. 2d 370, 377, 240 N.E.2d 150, 154.) The issue of self-defense presents a question of fact to be determined by the trier of fact, and if the trier of fact determines that the State has negated beyond a reasonable doubt any one of the elements justifying the use of force, then the State has carried its burden of proof. (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 674, 450 N.E.2d 1290, 1294; *People v. Ross* (1981), 100 Ill. App. 3d 1033, 1038, 427 N.E.2d 955, 959.) The decision of the trier of fact on the issue of self-defense will not be disturbed on review unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of guilt. *People v. Zolidis* (1983), 115 Ill. App. 3d 669, 674, 450 N.E.2d 1290, 1295.

■ Defendant initially argues that the evidence shows that he was justified in his use of force because his version of the events was not "realistically impeached" by the State, again arguing that none of the State's occurrence witnesses saw how the fight started, and pointing out that his version of the events was corroborated by Emery. This argument overlooks the fact that defendant's testimony was contradicted in certain material aspects. The trier of fact is not required to believe an accused's exculpatory statement, but rather, must consider the probability or improbability of that testimony, the circumstances surrounding the incident and the testimony of other witnesses. *People v. Easter* (1981), 102 Ill. App. 3d 974, 980, 430 N.E.2d 612, 617; *People v. Perez* (1981), 100 Ill. App. 3d 901, 905, 427 N.E.2d 229, 232.

Here, Cooper and Terrell testified that they never heard Rodgers threaten defendant. Although neither Cooper, Terrell nor Douglas saw the fight begin, they all testified that after becoming aware of the altercation, they never saw Rodgers strike defendant. Emery, who testified that she saw Rodgers chasing defendant, also stated that she did not see Rodgers hit defendant. The trial court found that there was insufficient evidence of the victim's aggression that would justify deadly force by defendant. The court further stated that "[a]ny quote, aggression, unquote, ended when the deceased fell, so there was no reason to exert force likely to cause death or great bodily harm." The court also found, based on the credibility of the witnesses, that defendant had no reason to fear the other men in the alley. Thus, the court concluded that even if Rodgers had been the initial aggressor, defendant's right to use deadly force in self-defense ceased once Rodgers was lying on the ground.

Defendant further argues that his claim of self-defense should have been accepted by the court based on his testimony that he feared that Rodgers was armed. Defendant emphasizes that portion of his testimony where he stated that he kicked Rodgers because Rodgers

reached into his back pocket after he fell. The trial court, however, was not required to believe defendant's testimony. All four of the occurrence witnesses, including Emery, testified that Rodgers did not move after he hit the ground. The testimony of these four witnesses was also consistent regarding the critical fact that defendant turned and started to leave before he turned again, returned to Rodgers, and repeatedly kicked and stomped him. In describing the incident, Terrell testified that defendant went all the way around Rodgers' body, kicking and stomping him in the head and chest. Emery stated that defendant got on Rodgers' chest and jumped up and down. Moreover, while the absence of a weapon is not determinative of the issue of self-defense (see *People v. White* (1980), 87 Ill. App. 3d 321, 323, 409 N.E.2d 73, 75), the record shows that no weapon was found on or near the victim.

■ Clearly, the evidence supports the trial court's decision to reject defendant's claim of self-defense. It is well established that the concept of self-defense does not permit the use of force, much less deadly force, against an antagonist after the antagonist has been subdued or is lying helpless on the ground. (*People v. Zolidis* (1983), 115 Ill. App. 3d 669, 674, 450 N.E.2d 1290, 1294; *People v. Seiber* (1979), 76 Ill. App. 3d 9, 14, 394 N.E.2d 1044, 1048; *People v. Driver* (1978), 62 Ill. App. 3d 847, 851, 379 N.E.2d 840, 844.) It was the trial court's duty to determine the credibility of the witnesses and resolve any conflicts in the testimony. Since the evidence supports the trial court's conclusion that once Rodgers was lying motionless on the ground and defendant had turned away defendant was not justified in returning to the victim and using force likely or intended to cause great bodily harm or death, we cannot say that the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt.

As an alternative argument, defendant contends that the evidence only supports a finding of voluntary manslaughter. A person commits voluntary manslaughter if he kills an individual without lawful justification under a sudden and intense passion resulting from serious provocation, or if he intentionally or knowingly kills an individual believing the circumstances justify or exonerate the killing, but his belief is unreasonable. (Ill. Rev. Stat. 1979, ch. 38, par. 9—2; *People v. Fausz* (1983), 95 Ill. 2d 535, 539, 449 N.E.2d 78, 80.) Whether a homicide is murder or manslaughter, or whether it is justified as self-defense, is a question to be determined by the trier of fact. *People v. Washington* (1984), 121 Ill. App. 3d 479, 485, 459 N.E.2d 1029, 1035.

■ We do not believe that the evidence here requires us to reduce defendant's conviction from murder to voluntary manslaughter. In re-

gard to "provocation" voluntary manslaughter, we reject defendant's argument that this case is similar to *People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764, where a conviction for murder was reduced to voluntary manslaughter because the court found that there was no pause in the combat between the defendant and the decedent which showed that the fatal blow was attributable to malice or revenge. Here, although defendant testified that he kicked Rodgers while Rodgers was on the ground because Rodgers was reaching into his back pocket, his testimony was contradicted by the three witnesses for the State and Emery. They all testified that Rodgers did not move after he fell and that defendant started to walk away from Rodgers but then returned and kicked and stomped him. With regard to the showing of malice necessary to sustain a conviction of murder, it is not necessary to show that a defendant deliberately formed the intent to kill. Malice may be implied where a defendant voluntarily and wilfully commits an act, the direct and natural tendencies of which was to destroy another's life. (*People v. Cowen* (1979), 68 Ill. App. 3d 437, 441-42, 386 N.E.2d 435, 439; *People v. Walden* (1976), 43 Ill. App. 3d 744, 752, 357 N.E.2d 232, 239.) The trial court could properly have found implied malice, and thus murder and not "provocation" voluntary manslaughter, under the circumstances here.

In regard to the "unreasonable belief" form of voluntary manslaughter, defendant points out that he feared harm not only from Rodgers but also from the other men in the alley. According to defendant, while this fear may have been unreasonable, it supports his contention that he subjectively believed that he was in danger. We fail to see, however, how defendant's fear of harm from Rodgers' friends, who were down the alley, in any way raised a fear in defendant in regard to Rodgers, himself, who was lying helpless on the ground. Moreover, the trial court specifically stated that based on the testimony of the witnesses and their demeanor, it did not believe that defendant was really afraid of Cooper, Terrell and the other men. We believe that the evidence supports a finding that defendant did not have a subjective belief that the force he used was necessary, which is consistent with the finding of murder, as opposed to a finding that defendant believed that the force was necessary, but his belief was unreasonable, which would have supported a finding of voluntary manslaughter. See *People v. Lockett* (1980), 82 Ill. 2d 546, 551-52, 413 N.E.2d 378, 381; *People v. Scott* (1981), 97 Ill. App. 3d 899, 903, 424 N.E.2d 70, 73.

Defendant next argues that he was denied due process of law when the trial court denied his request for a behavior clinic examination during his sentencing hearing. Defendant further posits that "the

prejudice spills over to the trial stage, and a new trial should be ordered with instructions to first conduct a competency hearing."

■■ A defendant is presumed fit to stand trial and be sentenced. He is deemed unfit if, because of his mental or physical condition, he is unable to understand the nature of the proceedings against him or to assist in his defense. (Ill. Rev. Stat. 1981, ch. 38, par. 104—10.) The issue of a defendant's fitness for trial or to be sentenced may be raised by the defense, the State or the court before, during or after trial. If a *bona fide* doubt of the defendant's fitness is raised, then the court shall order a determination of the issue before proceeding further. (Ill. Rev. Stat. 1981, ch. 38, par. 104—11 (a).) The initial inquiry as to whether a *bona fide* doubt has been raised is a decision resting within the discretion of the trial court, since it is in a better position to observe and evaluate the defendant's conduct. *People v. Bivins* (1981), 97 Ill. App. 3d 386, 389, 422 N.E.2d 1044, 1047.

Defendant's presentence report discloses the following information:

> "Now on psychotic medicines, Thorazine. From date of arrest (6-5-81) due to psychiatric problems was in Ward #3, North of Cermak Hospital to time of transfer 8-81. Then an out-patient for a year and a few months."

The report also includes a statement by defendant that he did not want leniency and that the court should prescribe the sentence of execution. At the sentencing hearing, defense counsel informed the court that defendant was taking two drugs in addition to the Thorazine. When during the sentencing hearing defendant orally asked the trial court to impose the death penalty, defense counsel requested a behavior-clinic examination to determine defendant's competency. The trial court responded that it did not believe that defendant's exuberance regarding the penalty requested raised a *bona fide* doubt of defendant's competency. Defense counsel stressed to the court the information relating to defendant's psychiatric treatment contained in the presentence report. The court observed that it was sure that defendant knew that he was not eligible for the death penalty, and defense counsel agreed, adding only that "[defendant's] comment to the court as to that type of penalty raises questions in my opinion."

■■ We do not believe that the trial court abused its discretion in denying the request for a behavior-clinic examination to determine defendant's fitness at trial and at the sentencing hearing. Defense counsel never suggested at any time that defendant was unable to understand the nature and purpose of the proceedings or to assist in his defense. (See *People v. Lego* (1965), 32 Ill. 2d 76, 78, 203 N.E.2d 875,

877.) In fact, the record reveals quite the opposite. Prior to trial, defendant requested that he be given access to the law library, and the court ordered that he should be allowed library privileges. When the court admonished defendant regarding his right to a jury trial, defendant acknowledged that he understood and then waived his right. Thereafter, defendant testified in his own behalf, providing thorough, coherent answers to questions posed on both direct examination and cross-examination. Prior to being sentenced, defendant presented the trial court with two written motions for a new trial which he had prepared. He then argued the motions, forcefully pointing out discrepancies in the evidence presented by the State.

Defendant's active and knowledgeable participation at both the trial and the sentencing hearing defeats his claim that he raised a *bona fide* question of his fitness at the time of those proceedings. Defendant's claim of unfitness is based upon (1) the information in the presentence report showing that he received psychiatric treatment following his arrest; (2) the statement in the presentence report that he was taking Thorazine and his counsel's representation that he was also taking two other drugs; and (3) his request for the death penalty. The nature of defendant's condition which warranted his hospitalization, however, was never disclosed to the trial court. The hospitalization ended more than a year prior to trial, and defendant's outpatient treatment also ceased before trial commenced. Moreover, the mere fact that a defendant has received psychiatric treatment is not sufficient to create a *bona fide* doubt of a defendant's fitness, since a defendant can be fit to stand trial although his mind may be otherwise unsound. (*People v. Murphy* (1978), 72 Ill. 2d 421, 433, 381 N.E.2d 677, 683.) Fitness speaks only to a person's ability to function within the context of a trial or sentencing hearing; it does not refer to competence in other areas. See *People v. Bivins* (1981), 97 Ill. App. 3d 386, 389, 422 N.E.2d 1044, 1047.

Similarly, a defendant's use of prescribed medication to manage mental disorders does not necessarily raise a question of the defendant's fitness (See *People v. Dominque* (1980), 86 Ill. App. 3d 794, 805, 408 N.E.2d 280, 289.) The relevant provision of the Code of Criminal Procedure provides that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." (Ill. Rev. Stat. 1981, ch. 38, par. 104—21(a).) This provision was interpreted in *People v. Tilson* (1982), 108 Ill. App. 3d 973, 439 N.E.2d 1298, where the court determined that the manifest purpose of the provision "appears to be to emphasize that the use of such drugs may signal a

defendant's incompetence to stand trial unless *** their use is shown, in fact, not to inhibit a defendant's fitness." (108 Ill. App. 3d 973, 977, 439 N.E.2d 1298, 1301.) The *Tilson* court concluded that the legislature did not intend to remove the right of a trial judge to exercise all discretion when he is possessed of sufficient information to assure that the particular defendant is fit to stand trial and to be sentenced. (108 Ill. App. 3d 973, 978, 439 N.E.2d 1298, 1301.) Here, the trial court was not made aware by defendant or his counsel of defendant's use of prescription medication until all of the proceedings were virtually concluded. There was no *bona fide* indication to the trial court either at trial or at post-trial proceedings that defendant was unfit. At the time the court denied defendant's request for a behavior-clinic examination, the court had for its consideration not only the information in the presentence report, but also its own observation of defendant's conduct at trial and the sentencing hearing. Accordingly, this situation is different from the situation where a defendant's drug use is made known to the court prior to trial. (See 108 Ill. App. 3d 973, 978, 439 N.E.2d 1298, 1301.) In view of defendant's active and intelligent participation in the trial and sentencing proceedings, the trial court did not abuse its discretion in denying defendant's request for a behavior-clinic examination based on defendant's use of prescription drugs.

Finally, the trial court found that defendant's request for the death penalty was not earnestly made and merely resulted from defendant's exuberance at being sentenced. The trial court had the opportunity to observe defendant throughout the trial and post-trial proceedings, and we see no reason to dispute its characterization of defendant's remark. We therefore conclude that even if the information concerning defendant's psychiatric history, use of prescription drugs and death penalty statement are considered together, they do not raise a *bona fide* question of defendant's competence either at the time of trial or at the sentencing hearing.

██ Next, defendant argues that he was denied effective assistance of counsel because his attorney did not adequately investigate his psychiatric background prior to trial and did not properly introduce evidence of Rodgers' intoxication. Representation by counsel is constitutionally deficient if the incompetence produced substantial prejudice to the defendant without which the result would probably have been different. (*People v. Royse* (1983), 99 Ill. 2d 163, 168-70, 457 N.E.2d 1217, 1220.) In determining the competency of counsel, the focus should not be on isolated instances during the trial, but rather, the totality of the circumstances must be considered. (*People v. Davis* (1981) 103 Ill. App. 3d 792, 796, 431 N.E.2d 1210, 1213.) Effective assistance of counsel

refers to competent, not perfect, representation. *People v. Stewart* (1984), 104 Ill. 2d 463, 491-92, 473 N.E.2d 1227, 1240.

Initially, we point out that the record reflects that defense counsel presented an able defense through his examination of defendant and his witness, Emery, his cross-examination of the State's witnesses, and the making of objections, where appropriate. Counsel also made a motion for a directed finding at the close of the State's case, and he presented a vigorous closing argument. In fact, the trial court commended defense counsel on how well he defended the case.

■■■ Turning to defendant's argument that defense counsel was incompetent because he failed to investigate defendant's psychiatric history prior to trial, we find such argument to be without merit. In view of our determination that there was no *bona fide* question of defendant's fitness to stand trial or be sentenced, we must reject defendant's contention that his counsel's incompetence was demonstrated by his failure to request a behavior-clinic report prior to trial. Defendant's further contention, that counsel's failure to investigate precluded defendant from possibly raising an insanity defense, is based on nothing more than conjecture.

Defendant's contention that the incompetence of his counsel is also manifested by his counsel's failure to introduce evidence of Rodgers' intoxication is also without merit. Defendant testified that when he arrived in the alley, he saw Rodgers take a drink from a bottle of Canadian Mist which the men were passing around. Defendant further testified that he believed Rodgers was intoxicated. Moreover, according to the stipulated testimony of Schaffer, the toxicologist, testing of a blood sample from the victim revealed that "the amount of alcohol in the blood [was] one hundred thirty-one milligrams." Thus defendant presented testimony regarding Rodgers' intoxication, and his testimony was bolstered by the stipulated testimony of the toxicologist. Defendant argues, however, that this evidence did not sufficiently establish the degree of Rodgers' intoxication and that his counsel should have introduced evidence showing that tests administered at the hospital where Rodgers was taken showed a higher concentration of alcohol in the victim's blood than was found in the subsequent tests performed by Schaffer. Defendant further argues that his attorney should have presented expert testimony regarding the significance of the amount of alcohol in the victim's blood. This additional evidence would have been important, according to defendant, because it would have corroborated his testimony that Rodgers was the initial aggressor.

Clearly, defense counsel's failure to present additional testimony of Rodgers' intoxication did not produce such substantial prejudice that

the outcome of the trial was affected. Evidence of Rodgers' condition was presented to the court through defendant's testimony and the stipulated testimony of the toxicologist. Also, during closing argument, defense counsel pointed out that under the Illinois Vehicle Code, the alcohol concentration in the victim's blood would have raised a presumption that the victim was intoxicated. Thus, the evidence which defendant claims his counsel failed to produce would have been mostly cumulative. Moreover, the trial court, in comments that it made at the sentencing hearing, acknowledged that Rodgers had been drinking but then stated that Rodgers' condition was not a defense. Under the totality of the circumstances, we conclude that defendant received effective representation.

In his final argument, defendant contends that he was denied due process of law when the police "misplaced" photographs taken at the police station which showed defendant reenacting his encounter with Rodgers. During cross-examination of the assistant State's Attorney who interviewed defendant following his arrest, defense counsel first learned that one or two photographs were taken at the Harvey police station where, with the assistant State's Attorney acting the part of Rodgers, defendant demonstrated how he had grabbed Rodgers. The assistant State's Attorney testified that the photographs had been at the Harvey police station but that they may have been misplaced. Defendant argues that the photographs should have been preserved so that he could have had the opportunity to see whether they were useful to his defense.

The State points out that defendant did not object to the nondisclosure of the photographs, did not make a motion for mistrial, and did not request a continuance in order to investigate the disappearance of the photographs. In addition, defendant failed to preserve this issue in any of his post-trial motions. Accordingly, the State argues, the issue has been waived. Defendant, however, urges this court to consider the issue under Supreme Court Rule 615(a) (87 Ill. 2d R. 615 (a)), which permits plain errors or defects affecting substantial rights to be considered even if they were not brought to the attention of the trial court. The purpose of the rule is both to prevent serious injustice to the defendant and to protect and preserve the integrity and reputation of the judicial process. *People v. Baynes* (1981), 88 Ill. 2d 225, 230-31, 430 N.E.2d 1070, 1072.

We strongly condemn negligent or intentional conduct by members of the police department or the State's Attorney's office which results in the destruction or misplacement of photographs, videotapes or similar devices used to record an accused's reenactment of the crime. Such

conduct cannot be tolerated, as it is potentially injurious to the defendant and subverts the integrity of the judicial process. It is not for the police or an assistant State's Attorney to determine whether the photographs or videotapes are important to the defense. Where the assistant State's Attorney chooses to utilize such devices, the State must be charged with their safekeeping. Contrary to the State's argument, we believe that the photographs were clearly discoverable under Supreme Court Rule 412(a), which governs disclosures that the State must make to an accused. (87 Ill. 2d R. 412(a).) Furthermore, section (c) of that rule (87 Ill. 2d R. 412 (c)) requires the State to disclose to defense counsel any material or information within its possession or control which would either tend to negate the guilt of the accused or tend to reduce his punishment therefor. Given that ours is an adversary criminal justice system, defense counsel, not the State, should determine whether photographed or videotaped reenactments of a crime by an accused may be useful to the accused's defense. (See generally *People v. Hammock* (1984), 121 Ill. App. 3d 874, 460 N.E.2d 378.) In view of these considerations, we believe that defendant's argument regarding the photographs should be considered under Rule 615(a).

 The evidence shown that the photographs related to defendant's demonstration of how he approached Rodgers and grabbed Rodgers by the t-shirt. During cross-examination, defense counsel elicited statements from the assistant State's Attorney which showed that defendant's testimony at trial regarding these aspects of the incident was consistent with the statements that he made at the time of his arrest when the photographs were taken. Therefore, since the missing photographs would have been merely cumulative of the testimony, and since they only related to acts which occurred before the victim fell to the ground and was rendered harmless, we conclude that defendant is not entitled to a new trial on the basis of the missing photographs.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA and WHITE, JJ., concur.