2023 IL App (1st) 221383-U

No. 1-22-1383

Order filed December 6, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12511 |
| | ) | |
| MICAH JEFFERSON, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices D.B. Walker and R. Van Tine concurred in the judgment.

**ORDER**

¶ 1     *Held*: The judgment of the trial court summarily dismissing defendant's first-stage petition for postconviction relief is affirmed.

¶ 2     This appeal arises from the August 17, 2022, first-stage summary dismissal of defendant Micah Jefferson's May 25, 2022, petition for postconviction relief. In his petition, defendant claimed that posttrial counsel rendered ineffective assistance by failing to investigate and present

evidence of defendant's psychiatric medication use, the side effects of such medication on his ability to represent himself at trial, and the effects of a head injury he suffered shortly before trial.

¶ 3 The trial court dismissed defendant's petition as frivolous and patently without merit.

¶ 4 For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5 I. BACKGROUND

¶ 6 Because we already summarized the evidence from defendant's trial in his direct appeal (*People v. Jefferson*, 2022 IL App (1st) 172484-U), we will reference only that which is pertinent to this appeal. Defendant was charged with multiple counts of aggravated kidnapping and aggravated criminal sexual assault against the victim, who was his girlfriend and the mother of his infant child.

¶ 7 During pretrial proceedings, defendant initially was represented by counsel, then elected to represent himself *pro se* for some time, later agreed to be represented by counsel again for a while, and ultimately elected to go *pro se*. When the jury trial commenced, defendant continued to represent himself *pro se*.

¶ 8 The evidence presented at trial showed that defendant, the victim and their infant child had been living together. One day in June 2014, defendant returned home in the early morning hours and eventually argued with the victim about spending her money. Thereafter, defendant struck the victim numerous times on her buttocks, lower back and thighs with his hand, a belt and an electrical cord. He also forced her to perform numerous sex acts where he penetrated her vaginally, orally

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

and anally. The victim also alleged that defendant choked her. When defendant fell asleep, the victim took the baby and went to her father's house. Thereafter, she went to the police, who arrested defendant.

¶ 9   Defendant took the stand on his own behalf and testified that the sex was consensual and the victim enjoyed role playing and rough sex. During the trial, he participated in jury selection, gave an opening statement, cross-examined witnesses, raised objections to the State's evidence, introduced evidence, made a closing argument, and requested a jury instruction for a lesser-included offense.

¶ 10   After the jury found him guilty of multiple counts of aggravated criminal sexual assault, defendant resumed representation by counsel and filed a motion for a new trial. This motion included an argument that prior to trial, defendant was not fit and the court erred in not having him evaluated for fitness. Counsel never mentioned, in the motion for a new trial or at the hearing on the motion, anything regarding defendant's psychiatric medication or head injury and any side effects from those issues that impaired his ability to represent himself. The trial court denied the motion for a new trial, stating that there was no evidence of defendant lacking in fitness and the evidence established that defendant understood the proceedings, represented himself quite well and was very articulate. The assistant state's attorney (ASA) commented that she had many conversations with defendant during the trial and at no time did he appear to be unfit. Rather, she stated that defendant was knowledgeable about many areas of the law and attempted to engage in negotiations.

¶ 11 Defendant refused to participate in the presentencing investigation report. At his sentencing hearing, his mother, Elaine Jefferson, testified that defendant was a bright, bubbly, and inquisitive child. His adolescent years were no different than those of her other children. He was a wonderful son, and although "he's had his problems," he was quiet, reliable and loved. Defendant was convicted of four counts of aggravated criminal sexual assault. The trial court sentenced him to 13 years' imprisonment for each count, to be served consecutively for a total of 52 years, which defendant was required to serve at 85%.

¶ 12 On direct appeal, he argued that he was deprived of a fair trial by the prosecutor's opening statement, examination of the witnesses, and closing and rebuttal arguments. He also argued that the trial court erred by refusing his requested instruction for domestic battery as a lesser-included offense and by denying his request to admit into evidence certain letters the victim wrote to him while he was in jail. This court affirmed defendant's convictions. *Jefferson*, 2022 IL App (1st) 172484-U.

¶ 13 In May 2022, defendant filed the *pro se* postconviction petition at issue in this appeal. His petition raised a number of issues, including that he was unfit for trial, that if he had been thinking clearly he would have accepted the State's pretrial offer, and that his posttrial counsel was ineffective. According to the petition, posttrial counsel was ineffective, *inter alia*, for failing to investigate defendant's mental health history and psychotropic medication use, and failing to present evidence of defendant's physical and mental health issues to the court during the proceedings on the motion for a new trial. Defendant claimed that the evidence regarding his

physical and mental health issues demonstrated that he was not competent to waive his right to counsel, stand trial, and represent himself.

¶ 14    Defendant claimed that he was over-medicated during his trial, suffered from side effects that impaired his ability to represent himself, and would not have chosen to represent himself *pro se* if he had known of the side effects and how he was affected during trial. According to his petition, he was prescribed and took 60 milligrams of Remeron before, during, and after trial, and the side effects of the drug caused him to be confused, disoriented, dizzy, and sleepy. As a result, he left in his jail cell questions for witnesses, diagrams of the victim's injuries, and his opening and closing arguments. According to defendant, he did not experience the side effects of the medication until trial began, at which point he was "stuck" going *pro se* and had no choice but to proceed *pro se*. If he had known the medication caused his irrational thinking, he never would have decided to represent himself *pro se*.

¶ 15    Defendant's petition states that he told posttrial counsel that the medication was given to him every night and disrupted his short-term memory, caused him to be disoriented, unable to focus, and to take quick naps at trial. He explained that the medication altered his way of thinking and the dosage was too high, causing irrational thoughts and actions. The petition also averred that posttrial counsel told him during a visit in jail that if counsel found any proof defendant was taking the medication, then counsel would bring it to the attention of the court. The petition faulted posttrial counsel for not investigating defendant's medication use and never informing the court about defendant's medication, how he was given a dosage that allegedly exceeded the

recommended dose set by the Federal Drug Administration (FDA), and the alleged side effects that defendant claimed negatively impacted his ability to function at trial.

¶ 16    The petition further claimed that, one week before trial, defendant suffered a serious head injury as the result of an attack by other inmates in jail. That injury resulted in a gash to his right eyebrow, which had to be glued together. According to defendant, this caused him to suffer from random moments of blindness and spells of confusion before, during, and after trial. The injury sustained as a result of the attack and the medication allegedly impaired his ability to observe, recollect, and relate occurrences, and his performance and motor processes were impaired during trial. According to the petition, defendant told posttrial counsel about these issues, but counsel never investigated and did not expound upon these issues at the proceeding on the motion for a new trial. Defendant maintains that if counsel had told the trial court about the side effects defendant suffered from the Remeron and head injury, the trial court would have ordered a fitness hearing, which would have shown that defendant was incompetent to stand trial.

¶ 17    In support of his claims, defendant attached a number of exhibits to his petition. The exhibits included (1) a prison psychotropic medication information sheet that listed sedation, weight gain and increased appetite as the possible side effects of Remeron, (2) jail medication lists for defendant indicating Remeron/mirtazapine, (3) documents from Cermak Health Services and medication orders for defendant, including prescriptions for two tablets of 30 milligrams of mirtazapine, and (4) copies of e-mails between defendant and his sister that listed the possible side effects of Remeron and other antidepressant medicines, such as manic episodes, visual problems, sleepiness, and effects on one's ability to make decisions, think clearly, or react quickly.

¶ 18 Also, the exhibits included documents relating to defendant's civil rights lawsuit under section 1983 of the United States Code (42 U.S.C. § 1983), which he filed after the jail attack, and a copy of the settlement agreement indicating that he accepted a monetary settlement of $3250. In addition, defendant stated that his current psychiatrist at the prison, Dr. Adams, could testify that 60 milligrams of Remeron was beyond FDA recommendations and more than inmates could receive in the prison. Defendant explained that because he was incarcerated and Dr. Adams was a State employee, defendant needed counsel to obtain an affidavit from Dr. Adams. Finally, defendant explained that his mother, Elaine Jefferson, had records and could testify about his mental health issues, but he needed counsel to explain to her the necessary steps to legally make a statement.

¶ 19 On August 17, 2022, the trial court summarily dismissed defendant's *pro se* petition as frivolous and patently without merit. The trial court stated that defendant's ineffective counsel claim was forfeited because it could have been raised on direct appeal. Forfeiture aside, the court found that all of defendant's self-serving claims of unfitness were clearly rebutted by the record, noting that defendant represented himself well at trial, including his questions, statements, conduct, and exchanges with opposing counsel and the trial court, which did not disclose a single instance of defendant's confusion about the nature or purpose of the proceedings. The trial court then provided specific examples of defendant's competency, including his written and verbal adversarial skills in his pretrial pleadings, jury selection, opening statement, examination of the witnesses, and closing argument. The court stated that defendant represented himself during a four-day jury trial and at all times demonstrated that he was "knowledgeable, intelligent, articulate, and

fully coherent." Further, the court observed that there were no supporting affidavits and the information attached to his petition was insufficient. The court concluded that none of defendant's claims had merit, and none of the allegations would have made any difference in the outcome of his motion for new trial. Defendant timely appealed.

¶ 20                                   II. ANALYSIS

¶ 21    In his appeal, defendant contends his postconviction petition established the gist of a claim that his posttrial counsel was ineffective for failing to investigate and present evidence at the motion for a new trial regarding the mental and physical side effects defendant suffered from the Remeron and head injury that impaired his ability to effectively and competently waive his right to counsel, stand trial, and represent himself. Defendant claims that he was over-medicated during his trial, suffered from side effects that impaired his ability to represent himself, and would not have chosen to represent himself *pro se* if he had known of the side effects and how he was affected during trial. Defendant also argues that if he had been thinking clearly he would have accepted the State's pretrial offer.

¶ 22    The State responds that the allegations in the petition are not sufficient to raise a *bona fide* doubt of defendant's fitness, which consequently negates any ineffective assistance of counsel claim. The State also claims the record positively rebuts any suggestion that defendant was unfit. Further, the State claims defendant failed to attach the appropriate supporting documentation to his petition. The State, therefore, maintains the petition was properly dismissed as frivolous and patently without merit.

¶ 23 The Post-Conviction Hearing Act (Act) provides a mechanism by which a defendant may raise a collateral attack against his conviction based on a claim of actual innocence or where there was a substantial denial of his rights under the Constitution of the United States, the State of Illinois, or both. 725 ILCS 5/122-1 *et seq.* (West 2020). The purpose of postconviction proceedings is to allow inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously on appeal. *People v. Buffer*, 2019 IL 122327, ¶ 12. Review of the trial court's dismissal of a postconviction petition is *de novo*, meaning we afford no deference to the trial court's decision. *Id.*; *People v. Randall*, 2016 IL App (1st) 143371, ¶ 44.

¶ 24 The Act sets out a three-stage process for the adjudication of postconviction petitions. *Randall*, 2016 IL App (1st) 143371, ¶ 45. At the first stage, the stage pertinent to this case, the trial court is required to determine only whether a petition is "frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020); *Buffer*, 2019 IL 122327, ¶ 45. In *People v. Brown*, 236 Ill. 2d 175 (2010), the Illinois Supreme Court explained that, at the first stage,

"the trial court examines the petition independently, without input from the parties. [Citation.] A petitioner need present only a limited amount of detail and is not required to include legal argument or citation to legal authority. [Citation.] A *pro se* petitioner is not excused, however, from providing any factual detail whatsoever on the alleged constitutional deprivation. [Citation.] The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim. [Citation.] This

standard presents a "low threshold" [citation], requiring only that the petitioner plead sufficient facts to assert an arguably constitutional claim [citation].

In considering the petition, the trial court may examine the court file of the criminal proceeding, any transcripts of the proceeding, and any action by the appellate court. [Citation.] The trial court must summarily dismiss the petition if it is frivolous or patently without merit. [Citation.] We recently explained that a *pro se* postconviction petition is frivolous or patently without merit only if it "has no arguable basis either in law or in fact." [Citation.] A petition lacking an arguable basis in law or fact is one "based on an indisputably meritless legal theory or a fanciful factual allegation." [Citation.] A claim completely contradicted by the record is an example of an indisputably meritless legal theory. [Citation.] Fanciful factual allegations include those that are fantastic or delusional. [Citation.]

Petitioner's claim of ineffective assistance of counsel is reviewed under the test established in *Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show counsel's performance was deficient and that prejudice resulted from the deficient performance. [Citation.] A postconviction petition alleging ineffective assistance of counsel may not be dismissed at the first stage of the proceedings if: (1) counsel's performance arguably fell below an objective standard of reasonableness; and (2) the petitioner was arguably prejudiced as a result. [Citation.]" *Id*. at 184-85.

¶ 25                                                  A. Arguable Basis in Fact

¶ 26    We first consider whether the allegations in defendant's postconviction petition set forth an arguable basis in fact for his constitutional claim. He alleged his constitutional right to effective assistance of counsel was violated because his posttrial attorney failed to investigate and present evidence of defendant's psychiatric medication use, the side effects of such medication on his ability to represent himself at trial, and the effect of a head injury he suffered shortly before trial. In support of his claim, defendant averred that he informed posttrial counsel that he was taking 60 milligrams of Remeron every night and the medication disrupted his short-term memory, caused him to be disoriented, unable to focus, take quick naps at trial, and have irrational thoughts and actions. In response, counsel said that if he found any proof defendant was taking the medication, then counsel would bring it to the attention of the court.

¶ 27    Furthermore, defendant averred that he told counsel he suffered from random moments of blindness and spells of confusion before, during and after the trial as a result of a serious head injury he suffered from an attack by other inmates in jail. Defendant averred that the head injury and medication use impaired his ability to observe, recollect and relate occurrences, and impaired his performance and motor processes during trial. Counsel, however, never investigated these issues or presented this information to the trial court to contest defendant's fitness to represent himself and stand trial. To corroborate these allegations, defendant attached medical records that showed he was prescribed and taking 60 milligrams of Remeron. He explained that he was unable to obtain affidavits from his psychiatrist and mother to support his claims concerning his mental health issues without the assistance of counsel.

¶ 28    We have consistently held that to survive summary dismissal, a postconviction petition need present only a limited amount of detail and is not required to set forth a constitutional claim in its entirety. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). Thus, a *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim to survive summary dismissal. *Id*. at 244-45. In reviewing *pro se* postconviction petitions, courts are encouraged to use a "lenient eye, allowing borderline cases to proceed." *People v. Hodges*, 234 Ill. 2d 1, 16 n.7 (2009). Even if a single claim in the *pro se* petition is deemed sufficient, the entire petition advances to the second stage. *People v. Tate*, 2012 IL 112214, ¶ 10.

¶ 29    Due process bars the prosecution of an unfit defendant. *People v. Hanson*, 212 Ill. 2d 212, 216 (2004). A defendant is unfit to stand trial if, due to a mental or physical condition, he is unable to understand the nature and purpose of the proceedings or to assist in the defense. 725 ILCS 5/104–10 (West 2020). The trial court must order a fitness hearing if a *bona fide* doubt is raised of the defendant's fitness. 725 ILCS 5/104–11(a) (West 2020). A number of factors may be considered in assessing whether a *bona fide* doubt of fitness is raised, including a defendant's irrational behavior, demeanor at trial, any prior medical opinion on the defendant's competence, and any representations by defense counsel on the defendant's competence. *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991). No fixed or immutable sign, however, invariably indicates the need for further inquiry on a defendant's fitness. *Id*. at 518. Rather, the question is often a difficult one implicating a wide range of manifestations and subtle nuances. *Id*.

¶ 30    We conclude that defendant's postconviction allegations cannot be characterized as fantastic or delusional. The petition sets forth sufficient facts to assert a claim that is arguably

constitutional. Accordingly, we conclude the petition cannot be deemed frivolous or patently without merit for lack of an arguable factual basis.

¶ 31                              B. Arguable Basis in Law

¶ 32    Next, we must determine whether the petition is based on an indisputably meritless legal theory. A legal theory is indisputably meritless if it is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16. All well-pleaded facts must be taken as true unless "positively rebutted" by the trial record. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). As noted, defendant claims his posttrial attorney was ineffective for failing to support the request for a fitness hearing by investigating defendant's mental and physical condition, discovering his health records, and presenting evidence during the motion for a new trial of his unfitness to stand trial and represent himself.

¶ 33    According to the medication list attached to his postconviction petition, defendant began taking 60 milligrams of Remeron on March 1, 2016, which was over one year before his trial, which occurred on April 25-28, 2017. He also alleged that he received a "serious head injury" during an "attack" while he was in jail on April 18, 2017, which was one week before the start of his jury trial.

¶ 34    The mere fact that the defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily raise a *bona fide* doubt of his fitness. *People v. Owens*, 139 Ill. 2d 351, 362 (1990). A defendant may be competent to participate at trial even though his mind is otherwise unsound. See *id*. "Fitness speaks only to a person's ability to function within the context of a trial or sentencing hearing; it does not refer to competence in other areas." *People v. Balfour*,

148 Ill. App. 3d 215, 226 (1986). In *People v. Mitchell*, 189 Ill. 2d 312, 331 (2000), this court held administration of psychotropic medication is not equivalent to a *bona fide* doubt of a defendant's fitness. In this case, however, defendant alleged more than ingestion of psychotropic medication. He alleged additional facts about sustaining a severe head injury. Defendant alleged that both his medication use and head injury adversely affected his ability to act rationally and effectively during the trial proceedings.

¶ 35    The allegations of defendant's sworn petition establish that he told posttrial counsel that he was taking psychotropic medication and had suffered a severe head injury in jail. Defendant further alleged that his medication use and head injury disrupted his short-term memory; caused him to be disoriented, unable to focus, and take quick naps at trial, caused him to have irrational thoughts and actions; caused random moments of blindness and spells of confusion before, during and after the trial; impaired his ability to observe, recollect and relate occurrences; and impaired his performance and motor processes during trial.

¶ 36    The State contends the record positively contradicts any suggestion that defendant was unfit to stand trial. The State notes that the ASA informed the trial court at the motion for a new trial proceeding that she had multiple conversations with defendant during the trial and at no time did he appear to be unfit. Moreover, the trial court stated there was no evidence of defendant lacking in fitness and the evidence established that he understood the proceedings, represented himself quite well, and was very articulate.

¶ 37    Defendant responds that many of his claims involved events that happened to him off the record. His allegations detailed how the medication negatively affected his thoughts and feelings

at the time—information that only could have been known to him and not evident to the judge or others at trial.

¶ 38   We agree with the State that defendant's legal theory is completely contradicted by the record of his own conduct in this case. Defendant appeared in court more than 40 times, conversed with the court on multiple occasions, drafted and argued pretrial motions on his own behalf, represented himself during a four-day trial that involved jury selection, giving an opening statement, cross-examination of the State's witnesses, testifying on his own behalf, giving a closing argument, and a jury instructions conference. Our review of the record supports the trial court's conclusion that at all times, defendant demonstrated that he was knowledgeable, intelligent, articulate and fully coherent. His questions, statements, conduct and exchanges with opposing counsel and the trial court cover 600 pages of the report of proceedings and do not disclose a single instance of confusion about the nature or purpose of the proceedings.

¶ 39   Defendant claims that during the relevant time period, he was manic, confused, disoriented, dizzy, sleepy, and agitated. He asserted that during the trial he experienced uncontrollable naps, blindness, impaired motor functions, inability to focus, and disruption to his short-term memory. However, he does not provide evidence of any of those alleged impairments during trial, and the record does not show any moments of confusion during his trial, any inappropriate demeanor, or irrational act. The record establishes that defendant fully understood the proceedings and competently conducted himself as his own counsel. He delivered a compelling opening statement and closing argument and successfully impeached some of the State's witnesses. He also took the stand to clearly testify in his own defense.

¶ 40    The record shows that defendant drafted his own pretrial pleadings, including an April 24, 2017, 10-page handwritten response to the State's proof of other crimes motion. Defendant's response was extremely legible, which contradicts his claim of a loss of motor control. That response also displayed excellent grammar, punctuation and vocabulary. He argued his response in a very convincing and articulate manner and even succeeded in having a key piece of evidence— a letter in which the victim wrote that he did not rape her—admitted for his defense at trial.

¶ 41    During jury selection the next day, defendant clearly understood the process, took notes, knew the names of each potential juror, successfully argued to remove a juror for cause, and exercised five of his seven peremptory challenges. Additionally, he demonstrated his focus and ability to keep track of important details. For example, when the trial court read the list of witnesses to the venire, defendant correctly noticed that his copy of the State's witness list was missing two specific names.

¶ 42    Defendant's opening statement was well-reasoned, articulate, and showed that he had a full grasp of the facts against him and how he intended to defend against those facts. Specifically, he laid out a detailed chronological series of events and told the jury that the sex was consensual and the victim enjoyed role playing and rough sex. He also told the jury what the State's evidence would not show—*i.e.*, he never used any knife or gun, there were no eyewitnesses, and the victim had no neck bruises despite her allegation that he violently choked her. He asked the jury to listen closely to the State's evidence of recorded telephone conversations between him and the victim while he was in jail and note how nonthreatening and loving the recordings portrayed him. He told the jurors that the victim visited him in jail after the incident and sent him money. Significantly,

he revealed that he would produce a letter from the victim in which she stated that defendant had not raped her. He also conceded that he asked the victim to change her statement to the police but did so only because the statement she gave was false.

¶ 43    The record establishes that defendant understood trial strategy and techniques. His cross-examinations were direct, concise and effective. He successfully impeached some of the State's witnesses on certain points, showing his clarity of mind to keep track of small details between the testimony of the various witnesses and documentary evidence. For example, he refuted witness testimony that he previously had injured the victim's lip and showed that the detective's report misidentified the victim's race. Defendant had the treating physician concede that the victim's vaginal wall abrasion was consistent with rough consensual sex. The physician also conceded that her report recorded no bruising on the victim's arms or strangulation marks, which contradicted the victim's version of the events. Under cross-examination, the victim conceded that she did not try to escape when she retrieved the electrical cord from another room and suffered no injuries when defendant allegedly dragged her back into the apartment. Moreover, defendant's choice not to cross-examine the State's expert witnesses was consistent with his defense theory of consent.

¶ 44    At the jury instructions conference, defendant showed his legal knowledge and strategic awareness when he requested the lesser-included offense of misdemeanor domestic battery, even though his request was ultimately denied. His closing argument, which filled 27 pages of the record, was well-organized, articulate, and persuasive. He effectively highlighted inconsistencies between the testimony of the detective, the victim, and her friend. In response to the State's argument that he tried to manipulate the victim and convince her to change her original statement

to the police, he argued that his manipulation skills must have been poor because the victim never changed that statement. He also argued the great significance of the victim putting in writing the statement that she was not raped.

¶ 45    Defendant's skilled representation and eloquent arguments were not made by someone suffering from "crippling" side effects from medication or a serious head injury. His claims of blindness, loss of motor control, and sleeping during the trial would not have gone unnoticed by the trial court during four days of trial. It also defies logic that defendant would not have taken the many opportunities to alert the trial court before and during trial to his alleged extreme disabilities.

¶ 46    We conclude that defendant's petition is frivolous or patently without merit because it has no arguable basis in law since it is based on an indisputably meritless legal theory that is completely contradicted by the record. See *Hodges*, 234 Ill. 2d at 16. Although *pro se* petitions must be given a liberal construction and are to be viewed with a lenient eye, a "[l]iberal construction does not mean that we distort reality." *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48. Accordingly, we affirm the decision of the trial court that dismissed defendant's petition at the first stage of the postconviction proceedings.

¶ 47                              III. CONCLUSION

¶ 48    For the foregoing reasons, we affirm the judgment of the trial court.

¶ 49    Affirmed.